In re MASONITE CORP. HARDBOARD SIDING PRODUCTS LIABILITY LITIGATION.

This Document Relates to all Actions.

Civil Action MDL No. 1098.

United States District Court, E.D. Louisiana.

Feb. 19, 1997.

Steven J. Harper, Kirkland & Ellis, Chicago, IL, Richard C. Stanley, Steven W. Usdin, Phillip A. Wittmann, and Stephanie D. Shuler, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, for Masonite Corp. Hardboard Siding Products Liability Litigation, In re.

Cameron Waddell, LeBlanc, Maples & Waddell, Baton Rouge, LA, for Philip Cuccia.

Patricia Howard, Washington, DC, Pro Se.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court is plaintiffs' Motion for Class Certification under Rule 23(b)(3) of a class composed of:

All individuals, proprietorships, partnerships, corporations, and other businesses and legal entities whose home, condominium, apartment complex or commercial building has Masonite Exterior Siding manufactured by Defendants. The class specifically excludes any building owned by and [sic] federal, state or local government, or by Defendants or any of its [sic] subsidiaries or affiliates.

Plaintiffs urge that the Court should certify a liability-only class, with an indeterminate number of subclasses to account for variations in fact and state law.[1] For the reasons that follow, the motion is DENIED.

### I.

#### A.

Masonite Corporation makes hardboard siding, a product that is used on building exteriors. Masonite has been making hardboard siding products for over 35 years. Since 1980 it has produced over six billion feet of hardboard siding for as many as four million homes in every state of the United States.

Hardboard siding looks like wood siding, but its composition and manufacture differ. Hardboard siding is made by grinding wood chips into wood fiber, and then subjecting the wood fiber to specified conditions of chemical exposure, heat, and pressure. This process recomposes the wood chips into solid boards.

Not every Masonite siding board is made the same way. Masonite has three manufacturing plants: in Laurel, Mississippi, Towanda, Pennsylvania, and Ukiah, California. Over time, the plants have used different inputs, equipment, and manufacturing processes. Masonite makes several siding prod-

ucts from different species of wood and different chemical additives; Masonite siding is made with either a "wet" process, in which water is added before pressing (as in Laurel and Ukiah), or a "dry" process, in which no water is added (as in Towanda); under either process, Masonite has used no single mix of heat and pressure; the eighty Masonite products differ in thickness, width, texture, color, and finish. Even within a given plant, Masonite varies its manufacturing process for different product lines.[2]

Some of the Masonite product comes with a 25-year warranty that the product is free of design and manufacturing defect. Plaintiffs contend that the company issued such a warranty to all plaintiffs and class members. But Masonite distributes two different classes of siding: Number 1 is represented to meet manufacturing specifications, and is warranted against certain defects, but Number 2 apparently comes without warranty. The Masonite warranty disclaims failures caused by improper installation, lack of proper maintenance, or other factors beyond Masonite's control. In addition to its express warranty, Masonite has, in the course of sales and promotion material to builders and homeowners, made representations regarding the fitness of its product.

#### B.

Plaintiffs claim that Masonite's siding is unable to withstand normal weather conditions. Their expert contends that limited durability and the relative weakness of the bonds between individual wood fibers in the board lead to problems with moisture cycling and allow water to seep into the siding. (Plaintiffs concede this degradation can vary with installation features and climate.) Moisture problems result in premature deterioration, rotting, discoloration, cracking, warping, splitting, delamination, and swelling. Plaintiffs further claim that defendants

---

1. The Court looks beyond the pleadings only in order to "understand the claims, defenses, relevant facts, and applicable substantive law" for Rule 23 purposes. *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5 Cir.1996).

2. A statistical analysis of Masonite claims data

knew of and concealed this problem.[3] Many plaintiffs and putative class members have had to replace the siding on their homes and businesses, and claim they have suffered a loss in property value due to their siding's poor appearance and constant need for maintenance.

Masonite counters that product failures are the result of errors in installation and finishing, as well as poor building design and construction.[4] The company points out it ships its products with detailed instructions, which it says many builders have failed to follow. Plaintiffs respond that any siding product so sensitive to installation is *per se* defective.

In November 1995, one of many suits around the country was filed in the Southern District of Mississippi. Plaintiffs in the Mississippi case claim the right to proceed as a class, and charge Masonite with negligence, breach of express written warranty, breach of express oral warranty, breach of implied warranty, strict liability, and fraud. Plaintiffs seek a declaration that the Masonite siding had manufacturing and design defects, and did not perform as expressly warranted. They seek compensatory and punitive damages, interest, costs, and fees. In April 1996, the Judicial Panel on Multidistrict Litigation ordered the Mississippi case transferred to this Court and consolidated for pretrial purposes with other federal lawsuits involving Masonite siding.[5]

*Naef v. Masonite Corp.,* Civ. Action No. CV–94–4033 (Circuit Ct., Mobile City, Ala.), a state court suit nearly identical to this one, was not a part of the MDL transfer, and went to trial in the Alabama system, where the trial judge certified a national class. In August and September 1996 the *Naef* case went to a jury trial on issues of defectiveness and breach of warranty, ostensibly under the law of 51 jurisdictions. The parties in these MDL cases are unclear, as is this Court, as to the uncertain meaning of the abstruse interrogatory responses in *Naef.*

## II.

To succeed with class certification, plaintiffs must satisfy the requirements of Rule 23(a) and Rule 23(b)(3). Class certification exists today in an environment of diminished respect. In recent Rule 23 cases, several courts of appeal, the Fifth Circuit included, have stated that federal district courts should not certify national classes in mass tort cases that arise under state law. *Castano v. American Tobacco Co.,* 84 F.3d 734 (5 Cir. 1996); *Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014 (11 Cir.1996); *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 626 (3 Cir.), *cert. granted,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996); *In re American Medical Systems, Inc.,* 75 F.3d 1069 (6 Cir. 1996); *Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293 (7 Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995).

### A.

#### Rule 23(a)

Rule 23(a)[6] defines the essential links for every class action: numerosity, commonality, typicality, and adequacy of representation.

---

indicates that failure rates vary by production year, manufacturing site, and product line.

**3.** Which they insist is generic to all Masonite siding products.

**4.** Masonite blames many product failures on errors in roofing design, window flashing, caulking, and placement of windows.

**5.** *Feliciana, et al. v. Masonite Corp., et al.,* No. 94–3974, (E.D.La.), *John Adler, III, et al. v. Masonite Corp., et al.,* No. 96–1326, (S.D.Miss.), *Phillip Cuccia v. Masonite Corp., et al.,* No. 96–1327, (S.D.Miss.), *Lennar Homes, Inc. v. Masonite Corp., et al.,* No. 96–3901, (S.D.Fla.), *Josh Jones, et al. v. Masonite Corp., et al.,* No. 96–3902, (S.D.Tex), *Munoz v. Masonite Corp., et al.,*

No. 96–3982, (S.D.Tex.), *Rodriguez v. Masonite Corp., et al.,* No. 96–3983, (S.D.Tex.), *Perez v. Masonite Corp., et al.,* No. 96–3984, (S.D.Tex.), *Gutierrez v. Masonite Corp., et al.,* No. 96–3985, (S.D.Tex.), *Chapa v. Masonite Corp., et al.,* No. 96–3986, (S.D.Tex.), *Robles v. Masonite Corp., et al.,* No. 96–3987, (S.D.Tex.), *Gonzalez v. Masonite Corp., et al.,* No. 96–3988, (S.D.Tex.), *Rodriguez v. Masonite Corp., et al.,* No. 96–3989, (S.D.Tex.), *Menchaca v. Masonite Corp., et al.,* No. 96–3990, (S.D.Tex.), *Trinidad v. Masonite Corp. et al.,* No. 96–3991, (W.D.Tex.).

**6. Rule 23. Class Actions.**

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1)

### i.

■ If a putative national class has any enduring characteristic, it is numerosity. Rule 23(a) simply requires that the class be so large that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). Plaintiffs observe that tens of thousands of homes have Masonite hardboard siding, and Masonite agrees the number might be as high as four million. Masonite does not seriously dispute numerosity, *compare Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 617 (S.D.Ohio 1996), and the Court finds that plaintiffs have satisfied that requirement.

### ii.

■ Questions of law and fact are common to the putative class. "The threshold of commonality is not high[,]" *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5 Cir. 1986), and requires only that "all or a substantial number of class members" be affected by resolution of common questions. *Id.* Here, plaintiffs present questions, the resolution of which could affect the entire putative class. They deal with the defectiveness of the Masonite product (inability to withstand normal weather conditions), and Masonite's knowledge and concealment of the defect. Common questions, although they do not justify a finding of predominance, do exist.[7]

### iii.

Like commonality, the typicality analysis focuses on the similarity of legal and remedial theories that inform the claims of named and unnamed plaintiffs. *Jenkins*, 782 F.2d at 472. The claims of the named plaintiffs seem typical of those of the putative class in the sense that the named plaintiffs all share similar facts and assert common legal theories of recovery regarding defendant's product and conduct. The product failures plaintiffs describe—rotting, discoloration, and changes in shape and size—all apparently result from the product's alleged problem with handling moisture. Similarly, the named plaintiffs all claim the common right of the Masonite warranty.

But the Court nonetheless has reservations regarding the typicality of these named plaintiffs. Counsel claim the product is "prone to fail," and the putative class includes all owners of buildings to which Masonite siding has been applied. But not all Masonite siding has experienced problems, although plaintiffs claim it eventually will. Tension between plaintiffs injured-in-fact and "exposure only" (no injury yet apparent) plaintiffs can present problems of both typicality and adequacy, *Georgine*, 83 F.3d at 618.[8] The fact that some putative class members may not have rights under Masonite's warranty presents still more problems of typicality. Plaintiffs proceeding under state laws that require consideration of plaintiff behavior or fault at the defect-liability stage present added problems. Finally, the fact that there appears to be no single Masonite product also weakens any claim to the typicality standard.

Plaintiffs contend that these problems and all related ones can be solved by creating subclasses and trying, first, the issue of Masonite siding's defectiveness, as authorized by Rule 23(c)(4). Because the Court finds that Rule 23(b)(3) problems of superiority and predominance are so overwhelming, it is unnecessary to decide the typicality issue.

### iv.

The same concerns give the Court pause regarding adequacy of representation. Class counsel must be qualified, and the named

the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

7. Predominance incorporates commonality, and many courts have treated the two as equals in the analysis. *See Georgine* 83 F.3d at 626. Other courts have simply "assumed that [commonality] was satisfied and thought it necessary only to rule on the question of whether the suit fit [predominance]." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1763 (1986).

8. Although *Georgine* will be decided by the U.S. Supreme Court, it involves only narrow issues regarding the character of a settlement class. Masonite's cases present far broader questions.

plaintiffs must be able to represent the class free of conflicts of interest. *Id.* In this case, no one has challenged the qualifications of counsel. But adequacy of representation, like typicality, can sometimes be problematic when named plaintiffs, who have an interest in maximizing a quicker recovery, are found not able to represent the interests of "futures" plaintiffs, whose siding might, as claimed, manifest inadequacies at a later date.

In sum, numerosity and commonality are present, but the Court is ambivalent about typicality and adequacy of representation; it need not reach a decision on those factors because of plaintiff's manifest failure to satisfy the Rule 23(b)(3) tests.

### B. *Rule 23(b)(3)*

Even if the prerequisites of Rule 23(a) are satisfied, a class action may be maintained only if one of Rule 23(b)'s requirements is also met.

Plaintiffs claim the right to proceed as a class under Rule 23(b)(3).[9] Rule 23(b)(3) tests are commonly referred to as the predominance and superiority standards. Although the 1966 drafting committee cautioned against certifying mass tort classes under this subdivision,[10] some courts have nonetheless indicated that certification of Rule 23(b)(3) national tort classes can be appropriate in cases of property damage or so-called "negative value suits." Although these MDL cases are negative-value suits for property damage, the Court holds that the state law and factual variations are so great as to preclude findings of predominance and superiority.

**9. (b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**10.** A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the victims in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. FED. R.CIV.P. 23(b)(3) 1966 Advisory Committee note.

### 1.

### *Predominance*

#### a. *Variations in State Law*

*Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), of course, instructs federal courts to apply state law to products liability cases, and that creates a large-scale problem. Differences among state laws, and they abound, can combine with fact differences among plaintiffs' many claims, making the class model unmanageable and inefficient. The Fifth Circuit has expressed an unfriendly skepticism about the class action as an acceptable dispute resolution scheme when such problems are encountered. *Castano,* 84 F.3d at 742 n. 15. This circuit's *Castano* decision imposes stringent tests on potential class plaintiffs that district courts must apply: the plaintiff has the burden of satisfying the court that class treatment is appropriate, the trial court must conduct a rigorous *de novo* review of state law, and conditional certification cannot justify a court's overlooking problems with predominance or superiority. *Castano* reflects a new scrutiny that is apprehensive of claims about the social utility of class actions in the mass tort setting.

It is, of course, theoretically possible to do a careful accounting of state law and craft a set of jury interrogatories which attempt to resolve tort issues in all jurisdictions, *In re School Asbestos Litigation,* 789 F.2d 996, 1010 (3 Cir.); *cert. denied* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986), but that analysis must be thorough and "extensive," *Castano,* 84 F.3d at 742. Despite this theo-

retical possibility, one must draw attention to the difficulties of instructing a jury with what Judge Posner cynically called an "Esperanto instruction." *Rhone–Poulenc*, 51 F.3d at 1300. The many state laws that define products liability issues vary in nuance, and nuance becomes terribly important. *Castano*, 84 F.3d at 742 n. 15 (citing *Georgine*) and at 750; *Rhone–Poulenc* 51 F.3d at 1300; *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1085 (6 Cir.1996); *Georgine*, 83 F.3d at 627; *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1024 (11 Cir.1996). The number of state products liability laws that confront Masonite and their doctrinal disonance, cannot be glossed over casually.

Plaintiffs here try to deal with the state law problem in two ways. They contend that no state law diversity problem is presented because all these MDL cases and the entire putative class can proceed under the law of Illinois, the state in which Masonite designs and tests its products, and where Masonite has its primary place of business. As an alternative, plaintiffs have provided the Court with a state law analysis which attempts to demonstrate the feasibility of conducting a "defect"-only trial under the state laws of 51 jurisdictions.

b. *Choice of Law Rules Preclude the Class From Proceeding Entirely Under The Substantive Law of Illinois*

 Plaintiffs' first point is mistaken. These cases cannot proceed entirely under the law of Illinois, or of any other single state for that matter. A federal court sitting in diversity must apply the choice of law rule of the forum in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed.

1477 (1941). And when a case is transferred, it is well-known that the transferee court, this Court, must apply the choice of law rule of the transferor court, whether that case is transferred under 28 U.S.C. § 1404(a), *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), or 28 U.S.C. § 1407. *See, e.g., In re Eli Lilly & Co. Prozac Products Liability Litigation*, 789 F.Supp. 1448, 1449–50 (S.D. Ind.1992); *In re Air Crash Disaster at Sioux City Iowa on July 19, 1989*, 760 F.Supp. 1283, 1285 (N.D.Ill.1991); *In re Sunrise Securities Litigation*, 698 F.Supp. 1256, 1261 (E.D.Pa.1988). Thus, plaintiffs' analysis of and reliance on Illinois choice of law rules is wrongly directed. The JPML transferred this case from the Southern District of Mississippi. This Court is thus bound to begin its analysis with Mississippi's choice of law rules.[11]

Mississippi's choice of law doctrine does not point to Illinois as providing the substantive basis to plaintiffs' claims in this suit.[12]

Under Mississippi's "center of gravity" test, "the law of the place where the injury occurred controls unless some other state has a more significant relationship to the accident and the parties." *Walls v. General Motors, Inc.*, 906 F.2d 143, 145 (5 Cir.1990). "Significance" is measured in terms of contacts: where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation, and place of business of the parties, and the place where the relationship, if any, between the parties is centered. *Id.*, at 146 (*citing Mitchell v. Craft*, 211 So.2d 509, 515 (Miss.1968)).

Mississippi's choice of law standard compels the Court to apply the tort law of each of the 51 jurisdictions in which plaintiffs have

**11.** The Court also sees little reason to respond at length to plaintiff's discussion of *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), and *In re Bendectin Litigation*, 857 F.2d 290 (6 Cir.1988); *cert. denied*, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989). If Mississippi's choice of law rules were to point to the substantive law of a single state, then the Court would need to analyze the Due Process and Full Faith and Credit limitations on the application of that choice of law rule. Only then would those cases be helpful. In *Bendectin*, the panel started with an analysis of applicable state choice of law rules. *Id.*, at 304. Further,

the *Shutts* rule of no substantive law difference, no constitutional injury, 472 U.S. at 816, 105 S.Ct. at 2976–77, is clearly inapplicable here, given the difference in substantive law revealed by the state law surveys.

**12.** Mississippi choice of law rules require a separate analysis for the different issues in any case, *Boardman v. United Services Automobile Assoc.*, 470 So.2d 1024, 1031 (Miss.1985), applying a separate analysis to tort claims and warranty claims. *Price v. Litton Systems, Inc.*, 784 F.2d 600, 602 (5 Cir.1986).

Masonite-sided buildings. The center of the parties' relationship lies in each of the 51 jurisdictions where plaintiffs own Masonite product; thus the analysis favors application of some law other than that of Masonite's primary place of business. *Cf. Price*, 784 F.2d at 604. One can imagine individual cases in which Illinois law could apply, but it is not possible that all plaintiffs could pursue tort claims under Illinois law.

Illinois law also cannot provide the sole basis for each plaintiff's warranty claims. Plaintiffs contend that their warranty claims rest on Uniform Commercial Code provisions which have been adopted in almost every jurisdiction in the United States.[13] In the absence of a party-agreed choice-of-law, Mississippi requires its own warranty law to be applied to UCC claims which bear an "appropriate relation" to Mississippi. *Price v. International Tel. and Tel. Corp.*, 651 F.Supp. 706, 709 (S.D.Miss.1986); Miss.Code.Ann. § 75–1–105 (West 1996). At the very least, this obstructs the application of Illinois law to the warranty claims of the Mississippi plaintiffs, and perhaps to the warranty claims of all plaintiffs who own siding manufactured in Masonite's Laurel, Mississippi plant. Certainly, the applicable choice of law rule prohibits the Court from adjudicating the class's warranty claims on an all-Illinois basis.

c. *Differences in Applicable State Substantive Laws Overwhelm Common Elements in the Plaintiffs' Claims*

Plaintiffs correctly point out that under *Castano* the Court may still perform a *de novo*, comprehensive state law analysis and certify a national class to pursue state law claims. 84 F.3d at 741. To carry their burden of proof, plaintiffs have provided the Court with a survey of state law on their tort and warranty claims. They boldly contend, "The variations among the jurisdictions for each count of the Complaint may be subclassed into, at most, five subclasses," and "the requirements for proving a *prima facie* case of negligence are almost uniform throughout all jurisdictions." The Court does not agree. After a careful review of the parties' submissions on state law differences, the Court is not persuaded by plaintiffs' position. As *Castano* admonishes, this Court cannot imagine managing a trial under the law of 51 jurisdictions on the defectiveness of Masonite siding.[14]

Plaintiffs cannot proceed as a liability-only national class pressing a negligence claim. Despite plaintiffs' reliance on *School Asbestos*, it is a stretch to characterize that case as standing for the proposition that state law does not vary on negligence. *Castano*, 84 F.3d at 743 n. 16. Although one can point to obvious common elements in the negligence law of each state (duty, breach, proximate cause, and injury), plaintiffs have not shown the Court that it is possible to give one negligence instruction which would account for all the varying nuances that state lawgivers command. *Rhone–Poulenc*, 51 F.3d 1293. (And bifurcating negligence and comparative fault would seem to violate the Seventh Amendment. *Castano*, 84 F.3d at 751.)

Adjudicating the claims of a national class on strict liability "defect" would require not only more than five subclasses, but also several juries. Within a given plaintiff-defined doctrinal group, states have different definitions of defectiveness. Some of these instructions could not possibly be given to the same jury.[15] States employ presumptions

---

**13.** When discussing the diversity of state substantive law, plaintiffs seem to indicate that they are not pursuing non-UCC contract claims. Mississippi's choice of law rule for non-UCC contract claims, a contract "center of gravity" test, also does not allow for the entire putative class to proceed under Illinois contract law. The subject matter of the contract is on each plaintiff's house, in one's home state. Also, any relevant negotiations, performance, and breach occurred where the siding was purchased, installed, and maintained. *See, e.g., Bunge Corp. v. Biglane*, 418 F.Supp. 1159, 1165 (S.D.Miss.1976).

**14.** Plaintiffs make their arguments despite the fact that most jurisdictions provide no tort action for economic loss. Fraud and breach of warranty are usually the only causes of action available to disappointed consumers who have suffered intangible commercial injury. Prosser and Keeton on Torts § 101 (5th Ed.1984).

**15.** By way of example, within plaintiffs' one subclass of so-called "risk-utility" states, some states (Georgia, Maryland, Ohio, New Jersey, and New York) let the jury hear factors to be balanced in its determination of "unreasonably dangerous." The majority of these states contemplate an illus-

based on different triggering conditions.[16] States have different formulations of the burden of proof.[17] Even in a liability-only trial, composite instructions accounting for all of these differences would hazard a chaos that seems counterintuitive to the spirit of Rule 23.

#### d. *Variations in Facts*

Variations in defendant's product and a siding user's conduct individualize each case, and thus also make class action patently inappropriate. Fact issues which vary among individual plaintiffs can overwhelm the common question of the manufacturer's conduct. *Castano,* 84 F.3d at 742, 743 n. 15; *Andrews,* 95 F.3d at 1025; *Georgine,* 83 F.3d at 626–627; *American Medical Systems,* 75 F.3d at 1081; *Rhone–Poulenc,* 51 F.3d at 1297. "In these circumstances," the Advisory Committee warned, "an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." Rule 23(b) 1966 Advisory Committee note.

It is instructive to recall here that there is no single Masonite manufacturing process or Masonite product, so even questions of product character and manufacturer conduct appear inappropriate for class-wide resolution. To repeat for emphasis, Masonite makes siding at three different plants, using different woods, additives, equipment, and processes. Over time, those variables have evolved differently at each plant. The end products vary in thickness (though perhaps not by

---

trative list, the appropriate factors and weight of which vary with the facts of each case. In Ohio, the jury is to be specifically informed when a particular factor is deemed significant. *Cremeans v. International Harvester Co.,* 6 Ohio St.3d 232, 452 N.E.2d 1281, 1284 n. 3 (1983). Texas, on the other hand, allows admission of evidence as to risk/utility factors, but prohibits the court from instructing the jury to balance specifically enumerated factors. *See Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 (Tex.1979).

**16.** The state law review focuses a thicket of contradictory decisions and poorly drafted statutes. State laws do not all give the same legal significance to similar fact conditions. For example, some state laws treat time on the market, state of the art, government regulations, or industry standards as creating rebuttable presumptions, whereas other states treat similar facts as affirmative defenses. The Court and the jury could be put in the impossible situation of employing, and then not employing, presumptions, and then accepting, and then not accepting, the same facts as affirmative defenses.

Colorado, Kentucky, and North Dakota utilize binding statutory presumptions which must be considered before any determination of defect is made. In Kentucky, it is presumed that a product is not defective if the injury or property damage occurred more than five years after the date of sale to the first consumer or more than eight years after the date of manufacture, KENTUCKY REV.STAT. § 411.310 (1978), and also presumes that products which are designed, manufactured and tested in conformity with the prevailing standards or state of the art are not defective. KENTUCKY REV.STAT. § 411.310 (1978). In Colorado, a product is presumed not defective ten years after it is sold for the first time, COLO.REV.STAT. § 13–21–403(3), when the product conforms to the state of the art, COLO.REV. STAT. § 13–21–403(1)(a), or when it conforms to applicable federal or state codes, standards, or

regulations. COLO.REV.STAT. § 13–21–403(1)(b). Though some courts have noted "puzzlement" over the effect of these states' statutory presumptions and held that they have no effect in a case in which the plaintiff already has the burden of proof, *see, e.g., Sexton v. Bell Helmets, Inc.,* 926 F.2d 331, 333 (4 Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *Mile Hi Concrete, Inc. v. Matz,* 842 P.2d 198, 205 (Colo.1992), the evidence is still relevant. The Court has found no case that allows the Court to overlook North Dakota law's presumption that a product is free from defect when the product's manufacturing, inspecting, and testing were in conformity with applicable industry standards. N.D.Cent.Code § 28–01.3–09 (Supp.1995). Of course, who has the burden of proof does not equate with keeping silent about statutory presumptions in the jury instruction.

Illinois, on the other hand, flatly prohibits state of the art as a defense to strict liability. *Murphy v. Chestnut Mountain Lodge, Inc.,* 124 Ill.App.3d 508, 79 Ill.Dec. 914, 919, 464 N.E.2d 818, 823 (1984).

Finally, in Ohio, a product is not defective if the harm for which the plaintiff seeks recovery could not be eliminated without substantially compromising the product's usefulness or desirability, or if, at the time the product left the manufacturer, a practical and technically feasible alternative design was not available.

**17.** Identical fact questions would have to be resolved under different allocations of the burden of proof. For example, California law assigns the defendant the burden of proof in the risk-benefit analysis, *Barker v. Lull Engineering,* 20 Cal.3d 413, 431, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), but Colorado law teaches that "plaintiffs also bear the burden of proving that the risks outweigh the benefits of the design." *Armentrout v. FMC Corp.,* 842 P.2d 175, 183 (Colo.1992).

much), width, texture, color, and finish; and have different failure rates.

Masonite's statistical analysis of claims made under its warranty program ably demonstrates that failure rates vary by product, year, and plant. William Dost, plaintiffs' wood expert, states that Masonite board is a generic product, essentially the same no matter what. But Dost admitted in a deposition that he knows very little about the different plants' manufacturing processes, and conceded that process, installation, maintenance, and building construction might yield different failure rates. This Court is reminded of the *Castano* injunction: "The party seeking certification bears the burden of proof[ ]" on certification issues. *Castano*, 84 F.3d at 740. From the evidence now before the Court, much of Masonite's conduct is different in a significant way for different class members.

Plaintiffs themselves vary in two important ways. Their siding was installed and maintained differently, and their relations with Masonite are not uniform. It is impossible to proceed on a class warranty trial, even under one state's law or the UCC.

Masonite plans to plead construction errors as a defense to liability, and has previewed for the Court its defensive contributory fault and causation themes by videotaping inspections of the named plaintiffs' homes. Masonite will argue that natural wood has rotted under differing installation conditions, and that good construction makes for long-lasting hardboard siding. Masonite points to a U.S. Department of Housing and Urban Development report, which concludes that widespread problems with Masonite siding in South Florida are primarily the result of poor home design, construction, and maintenance. HUD concluded that, although the product was installed properly on only a minority of homes, it performed well in those instances. The report goes on to comment that "quality of the individual tradesman has plummeted and the pride of workmanship has in many areas disappeared . . . Also, the homeowner has come to expect that little, if any, maintenance will be needed to maintain their homes." These issues will affect plaintiffs' rights under the Masonite warranty, and it is difficult to see how separate trials would not have to be conducted. Without judging the merits of plaintiff's claims, it is apparent that Masonite cannot receive a fair trial without a process which permits a thorough and discrete presentation of these defenses.

Location and climate around plaintiffs' homes are also likely to be varied factors. They affect moisture absorption, and go directly to the generalized claim of generic product defect.

Finally, plaintiffs differ in their relations with Masonite. Some have used warranted "Number 1" siding, and some have not. Some have relied on Masonite's advertising and representations, and some have not. Some do not even know that they have Masonite siding. Finally, this suit seeks damages for "futures" plaintiffs, some who are not even aware of an injury and might not have one now.

Plaintiffs claim that all Masonite siding is so faulty that installation should not matter, and that it is only a matter of time before the now-good siding rots or warps. But quarrels about contributory fault, causation, or reliance, will not disappear as issues. And if plaintiffs want to fashion a claim which avoids these defenses (the siding is "prone to fail"), then the case runs into *Castano's* admonition not to certify novel tort classes. 84 F.3d at 749.

Differences in state law and user facts overwhelm the common elements of plaintiffs' claims. Combined, these differences are so great as to make national class treatment unwieldy, unfair, and unlawful.

### 2. *Superiority*

■ What of the superiority threshold? These MDL cases involve property damage with far more pedestrian facts than *Castano*. And the cost of many individual lawsuits could exceed recovery value. Those considerations obviously tend to favor class treatment, but the Court finds that national class adjudication would not be superior to traditional dispute resolution methods. Individual questions of law and fact overwhelm common questions, and class litigation would easily become unmanageable and less efficient than litigation involving state-wide (or smaller)

classes, or even a series of individual suits that implicate collateral estoppel to effect judicial economy. *Rhone–Poulenc,* 51 F.3d at 1302.

In some instances, it becomes possible to divide a class action into "liability" and "damage" phases where a widely-relevant issue can be tried on a class-wide basis, saving time before holding smaller trials on damages and causation. *School Asbestos,* 789 F.2d at 1008.[18] Plaintiffs advocate such a trial model now. But fragmenting issues into a "core liability" trial on manufacturer conduct, to be followed by mini-trials on causation, comparative fault, reliance, and others seems to defeat the purported economies of class treatment, *Castano,* 84 F.3d at 749. Moreover, a "fraud class action cannot be certified when individual reliance will be an issue." *Id.* at 745. Also, bifurcation of manufacturer conduct and comparative negligence can violate Seventh Amendment considerations by having the second jury reconsider the decided factual question of manufacturer negligence. *Id.* at 750–751. This constraint is important to plaintiffs'

claims in both negligence and strict liability. *Id.*

The track record of trials on what plaintiffs call a national "crisis" does not favor certification of a national class. The Court has had the benefit of reviewing the transcripts of the *Naef* attempt at nationwide class adjudication of the claims against Masonite in Alabama state court. After its review of *Naef*'s proceedings and counsel's papers in this case, the Court has little confidence in plaintiffs' counsel's assurance of superiority and manageability.[19] Counsel in this case have not persuaded the Court that the outcome of a defect-only trial would be any different.[20] This Court shares *Castano's* skepticism and follows its counsel.

It is true that "the most compelling rationale for finding superiority in a class action" is the existence of a negative value suit, *Castano,* 84 F.3d at 748, and that courts have more latitude to certify classes in property damage suits. *Georgine,* 83 F.3d at 627; *Central Wesleyan College,* 6 F.3d at 181. However, the magnitude or kind of injury does not make these claims, by virtue of their

---

**18.** Plaintiffs note that issues of liability and damages have been separated in securities and antitrust cases, *see Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3 Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Blackie v. Barrack,* 524 F.2d 891 (9 Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), as well as in distinguishable products liability cases. *See Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468 (5 Cir.1986) (plaintiff class from one district to try "state of the art" issue under one state's law); *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 184 (4 Cir.1993) (conditional class certification, many defendants had settled with class); *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1197 (6 Cir.1988) (cause of action was defendant's "single course of conduct for each of the plaintiffs"); *In re Telectronics Pacing Systems, Inc.,* 168 F.R.D. 203, 220 (S.D.Ohio 1996) (only two nearly identical product models); *In re Copley Pharmaceutical, Inc.,* 158 F.R.D. 485 (D.Wyo.1994) (single product).

**19.** The jury has already returned verdicts in *Naef v. Masonite Corp.,* Civ. Action No. CV–94–4033 (Circuit Ct., Mobile City, Ala.). Plaintiffs pled state law tort and warranty claims, and the jury was given a five question jury form which attempts to resolve "Phase 1" of litigation for 51 jurisdictions. The state court allowed plaintiffs to try whether all Masonite siding is defective since it is "unreasonably prone to fail". The verdict is, at best, confusing.

*Naef* supplies ample evidence of legal and factual variation, and thus counsels against manageability and superiority. The *Naef* court's problems interpreting the verdict form shows that it is difficult to proceed under the law of 51 jurisdictions.

**20.** The parties have not discussed whether the Court should consider, as part of its predominance/superiority analysis, "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." FED.R.CIV.P. 23(b)(3)(B).

This factor is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits; therefore it is closely related to the question of whether the class action is superior to other adjudicatory methods. If the court finds that several other actions already are pending and that a clear threat of multiplicity and a *risk of inconsistent adjudications* actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, which is not always feasible, a Rule 23 proceeding only might create one more action.

WRIGHT AND MILLER, § 1780 (emphasis added). Today plaintiffs' counsel seeks to create one more national litigation class action in the name of the same set of plaintiffs. One wonders how judicial economy (or any other policy) is thereby served.

character, any the more suitable for class management.

### III.

Federal courts use Rule 23 to promote efficiency and judicial economy, but only when such use is consistent with fairness and federalism. In this case Due Process, the Seventh Amendment, *Erie,* and Rule 23 make it impossible to accommodate the theoretical benefits of class treatment.

For the foregoing reasons, plaintiffs' motion is DENIED.