### In re FORD MOTOR COMPANY IGNITION SWITCH PRODUCTS LIABILITY LITIGATION.

**Michael WILKS, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**FORD MOTOR COMPANY and United Technologies Automotive, Inc., Defendants.**

**[This Document Relates To: All Cases.]**

**No. MDL 1112.**
**Civil Action Nos. 96–3125(JBS),96–1814(JBS) and 96–3198(JBS).**

United States District Court,
D. New Jersey.

Aug. 28, 1997.

William S. Lerach, Leonard B. Simon, Patrick J. Coughlin, Alan M. Mansfield, Timothy G. Blood, Milberg, Weiss, Bershad Haynes & Lerach LLP, San Diego, CA, New York City, Richard S. Schiffrin, Schiffrin & Craig, Ltd., Bala Cynwyd, PA, Dianne M. Nast, Robert J. LaRocca, Mary Ann Cooke, Roda & Nast, P.C., Lancaster, PA, Leon H. Rose, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, NJ, Liaison Counsel, for Plaintiffs in MDL Action.

Mark C. Gardy, Peter D. Bull, Abbey & Ellis, New York City, Lubna Faruqi, Nadeem Faruqi, Faruqi & Faruqi, LLP, New York City, Philip M. Licht, Mount Laurel, Liaison Counsel, for Plaintiffs in Wilks Action.

Brian C. Anderson, John H. Beisner, Barton S. Aronson, Neil K. Gilman, Patrick R. Rizzi, Evelyn L. Becker, O'Melveny & Meyers, Washington, DC, Jennifer J. Chun, William J. Conroy, White & Williams, Westmont, NJ, for Defendant Ford Motor Co.

Scott L. Winkelman, David M. Schnorrenberg, Javier M. Guzman, Monica G. Parham, Crowell & Moring LLP, Washington, DC, for Defendant United Technologies Automotive, Inc.

## OPINION

SIMANDLE, District Judge.

### Introduction

Presently before the court are plaintiffs' motions for class certification in the above-captioned products liability cases. In both cases, plaintiffs' causes of action stem from an allegedly defective ignition switch found in approximately 23 million vehicles that were manufactured and distributed by defendant Ford Motor Company ("Ford") between the model years 1984 to 1993. The ignition switches themselves were manufactured by defendant United Technologies Automotive, Inc. ("UTA"). Plaintiffs allege these switches are defective because they have the propensity to short-circuit, allegedly causing damage from smoke or fires in over 2,000 vehicles.

In the first of the two cases before the court, plaintiffs Michael Wilks and others seek to certify a class of "all persons or entities who purchased or who leased, other than for purposes of resale or leasing, one or more Ford vehicles in model years 1984 through 1992 and vehicles from model year

1993 with ignition switches manufactured before October 1992, and whose vehicles caught on fire as a result of a defective ignition switch." (*Wilks* Pl. Not. of Mot.), hereafter the "*Wilks* case". No personal injury or wrongful death claims are asserted in the *Wilks* case.

The second case is actually a nationwide consolidation of cases from various courts, each involving plaintiffs who own Ford vehicles of the subject 1984–93 model years who do not allege that their Ford vehicles have caught on fire as a result of the allegedly defective ignition switch, which have been transferred to this court through the Judicial Panel on Multidistrict Litigation, hereafter the "MDL case." The lead MDL case, *Yvette Veideman v. Ford Motor Co.*, Civil No. 96–948, was filed in this District. Those plaintiffs seek certification of a class consisting of "[a]ll persons and entities who purchased, other than for purposes of resale or leasing, and currently own one or more Ford vehicles in model years 1984 through 1992 and vehicles for model year 1993 with ignition switches manufactured before October 1992." (MDL Pl. Not. of Mot.). No members of the proposed class in the MDL case have actually sustained smoke or fire damage in their vehicles.

The issue raised by these motions is whether plaintiffs have satisfied the prerequisites for class certification set forth in Fed. R.Civ.P. 23. For the reasons discussed below, the court concludes that plaintiffs have not, and therefore the court will deny the certification motions in both the *Wilks* and the MDL cases, without prejudice to reapplication consistent with the reasoning of this opinion.

### Background

Plaintiffs' underlying allegations in the MDL case and the *Wilks* case are similar. Plaintiffs contend that certain ignition switches manufactured by defendant UTA and installed in vehicles by defendant Ford were defective. All told, plaintiffs allege that UTA manufactured and Ford installed approximately 25 million ignition switches of the same or substantially identical design in every Ford vehicle during model years 1984 through 1992 except Taurus, Sable and Probe, together with certain 1993 models produced before October 1992. Plaintiffs explain that as a result of that defect, a short circuit may be created in the switches, possibly leading to ignition of a fire, and plaintiffs allege that at least 2,000 vehicles caught fire or sustained damage from melting or smoke as a result of the defective ignition switch. Such fires can allegedly occur while the vehicle is being driven or when the vehicle is parked and the engine is off. Plaintiffs allege that defendants knew or should have known of this alleged defect before the first of these switches was ever installed, and in any event by 1985 when the first consumer reports of related fires were allegedly made to Ford. Plaintiffs further allege that the faulty ignition switch can be replaced by a redesigned switch at a cost of about $75.00 per vehicle.

In 1992, administrative agencies in the United States and Canada began investigating reports of fires caused by the defective ignition switches. On November 29, 1995, Ford Motor Company of Canada, Ltd. ("Ford Canada") announced the recall of 248,000 vehicles to replace the ignition switch at no expense, with Ford Canada warning that the ignition switches in the recalled vehicles could short-circuit, leading to overheating, smoke and possibly fire in the steering column area of the vehicle while in use or unattended. See Mem. to All Ford of Canada Dealers from J. White of Ford Canada, Nov. 29, 1995 (reproduced at Faruqi Ex. 29). Ford Canada recalled only a fraction of the models having the allegedly faulty ignition switches,[1] allegedly based on Ford Canada's analysis of the incident rates of reported problems, as stated in various Ford Canada documents (reproduced at Faruqi Exs. 13, 27 & 30). Ford Canada had allegedly received 261 reports of vehicle fires from 1988–91 model vehicles by November, 1995, which it

---

1. The Ford vehicles in the November 1995 Canadian recall were all Escorts (model years 1989–90), Mustangs (1989–91), Thunderbirds and Cougars (1990–91), Crown Victoria and Grand Marquis (1988–89), Lincoln Town Cars (1989), Aerostars (1989–91) and Broncos and F–Series Light Trucks (1990). See Ford Canada Press Release of Nov. 29, 1995 (at Faruqi Ex. 28).

had analyzed before the recall in Canada. (*Id.* Ex. 27).

On April 25, 1996, in the United States, defendant Ford announced a recall of some of the models that purportedly contain the defective switch, consisting of approximately 8.3 million vehicles, allegedly comprising the largest single-manufacturer recall in U.S. history. Ford declined to recall the remaining 15 million vehicles having the same or similar ignition switch, in models allegedly having a lower (or null) rate of reported incidents according to Ford's analysis. The National Highway Traffic Safety Administration ("NHTSA") has not, to date, required Ford to recall additional model years of vehicles beyond Ford's April 25, 1996 recall.

Also in April 1996, plaintiff Wilks filed his complaint in this court. The court subsequently consolidated the *Wilks* case with another case, known as *Art's Transportation,* which also had been brought by plaintiffs who allege that a defective ignition switch had caused a fire in their Ford vehicles. The court designated the Wilks case as the lead case. The *Wilks* complaint, as amended, names 70 similarly situated owners of Ford vehicles which have experienced a fire problem in the past.

The court first became familiar with the legal claims brought by those plaintiffs who do not allege that their Ford vehicles ever caught on fire when defendant Ford removed to this court a complaint filed by plaintiff Yvette Veideman in New Jersey Superior Court. In June 1996, the Judicial Panel on Multidistrict Litigation began transferring to this court all similar "non-incident" claims that had been filed in federal courts across the country. See *In re Ford Motor Company Ignition Switch Products Liability Litigation,* MDL No. 1112 (Order filed June 27, 1996). Those cases have been consolidated into this one "MDL" action. The MDL action is currently comprised of 12 cases which have been filed as class actions and transferred to this court from 11 districts nationwide.

In both *Wilks* and the MDL case, plaintiffs bring the following causes of action: 1) strict products liability, 2) fraudulent concealment, 3) violation of state consumer fraud statutes, 4) breach of contract and express warranty, and 5) breach of implied warranty of merchantability. The plaintiffs in the MDL case also bring a cause of action under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* The Magnuson–Moss claim was added by the MDL plaintiffs in a Consolidated Amended Class Complaint, naming 113 additional plaintiffs, for a total of 119 proposed class representatives asserting Magnuson–Moss Warranty Act claims.

After the filing of the complaints, defendants filed motions to dismiss the claims brought by the named plaintiffs in the MDL case. The court has deferred ruling on those motions and on a second round of dismissal motions addressing claims raised in the amended pleadings. Defendants in both the MDL action and the *Wilks* action also moved to strike all class allegations in these cases, on the grounds that the named plaintiffs could not maintain a class action because they would be unable to provide proper notice to all putative class members. In an Order dated February 21, 1997, the court denied that motion without prejudice, determining that the motion was premature.

In this Opinion, the court addresses the class certification motions recently brought in this case. The plaintiffs in *Wilks* have moved for certification of an approximately fifteen hundred member class, the exact number being unknown, consisting of those persons who have allegedly sustained property damage to their vehicles caused by the allegedly defective ignition switch. In contrast to *Wilks,* the MDL class, if certified, would include approximately 23 million members. The MDL plaintiffs ask the court to certify two subclasses in the MDL case: one consisting of those plaintiffs whose Ford vehicles have sustained no damage and have been recalled [2], and one consisting of those

---

**2.** The following models and years were subject to the April 1996 recall, and these owners are the putative class plaintiffs of the first MDL subclass: Escort (1988–90); EXP (1988); Mustang (1988–

early 1993); Tempo/Topaz (1988—early 1993); Thunderbird/Cougar (1988—early 1993); Crown Victoria/Grand Marquis (1988–89); Lincoln

plaintiffs whose vehicles have sustained no damage and were not part of the April 1996 recall.[3] There are a total of 158 model/years at issue in this certification motion.[4]

### Discussion

■ Rule 23 of the Federal Rules of Civil Procedure sets forth four general preconditions that putative class representatives must satisfy before any case is certified as a class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Additionally, Rule 23(b) defines four different types of class actions, and the party seeking certification must demonstrate that the case falls within one of the Rule 23(b) categories. The plaintiffs bear the burden of proving that the proposed class action satisfies each of the requirements of Rule 23(a) and one of the prerequisites of Rule 23(b). *See Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994).

■ A motion for class certification should not turn on the court's evaluation of the merits of the parties' legal or factual claims. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). The court may find it necessary, however, to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996) (citing Manual for Complex Litigation 3d § 30.11 (3d ed.1995)).

In both the MDL case and the *Wilks* case, plaintiffs have moved for class certification under Fed.R.Civ.P. 23(b)(3) or, in the alternative, under Fed.R.Civ.P. 23(b)(1)(A). The court will now proceed to address whether plaintiffs are entitled to class certification under either of those two provisions. Because the court concludes that class certification is not appropriate under either Rule 23(b)(3) or Rule 23(b)(1)(A), the court need not and does not reach the question whether plaintiffs have satisfied the threshold Rule 23(a) requirements.

### I. Rule 23(b)(3) Class Action

■ Plaintiffs' moving papers are dedicated almost entirely to the argument that plaintiffs are entitled to class certification under Fed.R.Civ.P. 23(b)(3). In order for a class action to be certified under Rule 23(b)(3), the putative class representatives must show, in addition to the four general prerequisites of Rule 23(a), that:

> questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). The Supreme Court has recently interpreted Rule 23(b)(3)'s requirements when it affirmed the Third Circuit's determination that certification of a nationwide settlement class for alleged asbestos victims was improper. *Amchem Prods., Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), *aff'g Georgine v. Amchem Prods., Inc.,* 83 F.3d 610 (3d Cir.1996). Whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" may be referred to as the predominance requirement. The predominance inquiry "trains on the le-

Town Car (1988–89); Aerostar (1988–91); and Bronco/F–Series Light Trucks (1988–91).

**3.** The following models and years contain the allegedly defective ignition switch but have not been recalled, and these owners are the putative class plaintiffs of the second MDL subclass: Aerostar (1986–87); Bronco/Continental/Cougar/Crown Victoria/Escort/EXP/E–Series Light Truck/Grand Marquis/Lincoln/Lynx/Mustang/Tempo/ Thunderbird/Topaz (1984–87); Bronco II (1984–90); Capri/LTD/Marquis (1984–86); E–Series (1984–93); Explorer (1991–93); Mark (1984–89); Ranger (1984–early 1993).

**4.** See n. 2 & 3, *supra.*

gal or factual questions that qualify each class member's case as a genuine controversy...." *Amchem Prods., supra,* —— U.S. at ——, 117 S.Ct. at 2249. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (citing 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1777, at 518–519 (2d ed.1986)).

The Supreme Court has noted that the predominance requirement is not met when there exist a greater number of questions peculiar to the several categories of class members, and to individuals within each category, where such uncommon questions are significant. *Id.* at ——, 117 S.Ct. at 2250. In the context of the massive class certified by the district court in the *Georgine* asbestos litigation, the Supreme Court held that the class cohesion that might emerge from the common issues of fact regarding the consequences of asbestos exposure was undermined by the disparities among class members in the means of exposures to different asbestos-containing products, for various lengths of time, resulting in disparities in injury ranging from no physical injury to lung cancer or mesothelioma, with complications of causation arising from cigarette smoking. *Id.* at ——, 117 S.Ct. at 2250 (quoting the Third Circuit's discussion in *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 626 (3d Cir.1996)).

The predominance inquiry also must focus upon the cohesiveness of the class as to commonality of remedies. With reference again to the *Georgine* class, whose members included persons who had been exposed to asbestos with no physical injury, while other members had extremely serious medical conditions, the stark differences in injury and anticipated medical needs among class members was a further undermining factor. *Id.* (quoting *Georgine,* 83 F.3d at 626).

The predominance inquiry must also take stock of the applicable law. Common questions of law may be said to predominate when significant legal issues are common to each class member's cause of action or to the defense of such claims. Thus, according to the Supreme Court's *Amchem Products* deci-

sion, "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.... Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement." *Id.* at ——, 117 S.Ct. at 2250.

Where the source of law derives from the law of the 50 states, as opposed to a unitary federal cause of action, however, differences in state law will "compound the[ ] disparities" among class members from the different states. *Id.* Thus, as discussed more fully below, certification of a nationwide class in which the law of the 50 states, rather than federal law, must be identified and applied, places the burden upon plaintiffs to "credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986) (citations omitted); *see Georgine,* 83 F.3d at 627; *Castano v. American Tobacco Co.,* 84 F.3d 734, 740 (5th Cir. 1996); *In Re American Med. Systems, Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996).

That common issues must be shown to "predominate" does not mean that individual issues need be non-existent. All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other. *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Hassine v. Jeffes,* 846 F.2d 169, 176–77 (3d Cir.1988). The individual differences, however, must be of lesser overall significance and they must be manageable in a single class action, as discussed further below.

In the present case, plaintiffs cite numerous examples of allegedly common questions of law and fact, including:

(a) Whether the subject switch is defective;

(b) Whether defendants knew or reasonably should have known that the vehicles contain a dangerous, latent defect;

(c) Whether defendants caused the distribution and sale of the vehicles under false

pretenses by, among other things, concealing the alleged ignition-switch defect;

(d) Whether defendants' conduct violated common and/or statutory law as alleged;

(e) Whether the Class members have been damaged and/or suffered irreparable harm.

MDL Pl. Mem. in Support of Cl. Cert. at 28. The liability issues are said to be predominately common because the ignition switches in the vehicles belonging to class members are allegedly identical in material respects, as plaintiffs argue:

(a) The switches all have a common design;

(b) Defendants admitted on at least ten occasions that the switches are identical; and

(c) Ford's explanation of the cause of the defect, whether in 1993 or 1996, regardless of the vehicles studied, is the same.

*Id.* at 33. Plaintiffs identify as the "core liability issue" the determination whether the ignition switch, and thus the product containing the switch, is defective, which is a necessary element of plaintiffs' strict liability claims. *Id.* at 34. Plaintiffs argue that their breach of contract and breach of express and implied warranty claims present predominately common issues centering upon whether defendants' assertions that the vehicles were free of defects in workmanship and materials were untrue because the vehicles have defective ignition switches that render the vehicles unfit for their ordinary use. *Id.* at 35. Likewise, plaintiffs argue that defendants engaged in fraudulent concealment by failing to disclose the defect to all purchasers. *Id.* at 36. Plaintiffs' deceptive trade practice claims likewise are said to hinge on the same issues, with focus on defendants' knowledge and acts. Defendants, on the other hand, argue that no classwide proofs of defect can be available for the MDL class where no ignition defect has manifested itself in any MDL class member's vehicle, and where a short circuit mechanism in a minuscule fraction of the switches demonstrates that the "defect" is not common. Defendants allege that the *Wilks* class plaintiffs have different causation problems to overcome, and different types of damage, requiring individual proofs of causation and damages.

█ Throughout the discussion that follows, the two proposed MDL subclasses (those whose vehicles were recalled and those whose vehicles weren't) are treated generally as a unit, because they have in common an allegedly non-manifested defect. These subclasses have a relatively small individual claim, centering upon a $75.00 part, for which free replacement has been offered to the 8.3 million owners in the putative recall subclass, while the 14 million owners in the putative non-recall subclass seek this remedy in addition to such other damages and injunctive relief as is available. Both MDL subclasses assert that this unmanifested defect in the ignition switch has caused their vehicles to lose value. Generally speaking, the class action mechanism can be used as an efficient means of obtaining a remedy for a property damage claim which is relatively insignificant for an individual to pursue, but which becomes highly significant when numerous similarly situated persons are joined. *See, e.g., Deposit Guaranty Nat. Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980) (stating: "Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.")

For the *Wilks* plaintiffs, their claims include actual, measurable damage allegedly caused by the defective switch. The recall remedy is not a meaningful one for them, and money damages are sought. The *Wilks* plaintiffs' essential allegation—that the ignition switch caused harm—places them quite apart from both MDL subclasses, who seek to avoid such harm if their ignition switches fail in the future.

Against this background, the court considers whether either of the MDL subclasses or the *Wilks* class has been shown by plaintiffs to be certifiable as a class action.

In this case, the court will deny plaintiffs' motion for class certification under Rule 23(b)(3) because plaintiffs are unable to satisfy either the common question prong or the superiority prong of the rule. The principal

reason for denying class certification, in the MDL case and the *Wilks* case as explained below, is plaintiffs' failure to demonstrate a suitable and realistic plan for trial of the class claims which arise under the differing laws of the fifty states. Moreover, if the court were to certify the proposed nationwide MDL class in this case, it would be compelled to establish countless subclasses taking into account not only differences in state law but also in model years, thereby rendering this case unmanageable for disposition in a federal forum in a single case. For the *Wilks* cases, the 50–states law problem is compounded by defenses to causation as a common issue, as Ford has already cast doubt on causation claims of various class representatives whose car fires may have had nothing to do with any ignition switch, faulty or not, as now discussed.

### A. The Predominance of Issues Affecting Only Individual Class Members

With respect to the certification of the two MDL subclasses, we must examine, for a potential class of 23 million members owning vehicles in 158 model/years, none of which has actually sustained property damage caused by the potentially defective ignition switches, whether class-wide issues are likely to predominate. These claims would be adjudicated under the relevant laws of the 50 states, pertaining to potentially each of the five causes of action arising at state law thereunder. For the proposed *Wilks* class, the predominance inquiry is much narrower, focussing upon whether the common legal and factual issues are predominant among the 1,500–2,000 vehicle owners who have allegedly sustained property damage due to ignition switch fires.

For the reasons next discussed, the finding that class-wide issues do not predominate over issues involving only individual plaintiffs results from the following three conclusions reached by the court: 1) even the basic question of whether plaintiffs' ignition switches are defective will depend on facts particular to each individual plaintiff; 2) issues such as privity, reliance, and defendants' affirmative defenses may not be adjudicated on a class-wide basis; and 3) the

court is compelled to apply the law of each plaintiff's home state to that plaintiff's claims, and thus class-wide disposition of the claims would essentially be impossible.

### 1. Common Factual Issues Do Not Predominate

#### a. The Adjudication of the Defect Issue on a Class–Wide Basis

On each of plaintiffs' causes of action, the question whether the ignition switches in plaintiffs' vehicles are defective is vital to plaintiffs' attempts to establish liability. Indeed, plaintiffs have pointed to this central, allegedly "common" question of defect in order to establish the predominance of common, class-wide issues in this case. The court concludes, however, that the question of defect may be likely to turn in this case on facts particular to each individual plaintiff, or, at the very least, assessments of risk for each of the 158 model/years at issue.

Plaintiffs primarily contend that the ignition switches at issue in this case are all essentially the same and are uniformly defective because in each of the switches the positive terminal and the ground terminal are located too close together. Plaintiffs contend that if the terminals were "sufficiently separated," the possibility of failure would be eliminated. Plaintiffs further argue that in previous statements issued by Ford, Ford itself acknowledged that all of the vehicles in question contained the same ignition switch. (*See, e.g.,* Blood dec. Ex. 7, 17). On that basis, plaintiffs contend that the question whether the switches are defective may be adjudicated on a class-wide basis. Plaintiffs also argue that Ford's recall of some of the vehicles at issue in this litigation, which encompassed varying models and model years, demonstrates that Ford itself viewed the defect as amenable to class-wide remedy.

Defendant Ford has proffered evidence indicating that the defect issue may not be susceptible to class-wide proof in this case. Defendants aim to prove at trial that the likelihood of ignition switch malfunction is dependent on the car model, the model year, and the conduct of the car operator, among other factors. Thus, according to Ford, because the defect issue is one that may be

resolved only by looking at the facts surrounding the claims of each individual putative class member, class-wide resolution of that issue would be inappropriate and unfair to defendants.

Understanding defendants' argument requires some knowledge of how an ignition switch works. As defendants explain:

> An ignition switch ... basically consists of several flat copper terminals attached to a plastic base or block (made of Minlon plastic, and referred to by that trademarked name), and several flat copper conductors (or "sliders") that slide across the top of the terminals, completing various electrical circuits. When a driver turns the ignition through its different positions, the slider moves across the terminals, completing different circuits. Every time a circuit is made or broken, there is an "arc," or electrical spark, in the switch, which dissipates in the air. . . .

> For purposes of this litigation, two terminals are particularly important: the positive (B+) terminal and the ground terminal. Between the B+ terminal and ground there are an air gap and a Minlon wall, which is simply a protrusion of the Minlon base of the switch. When a driver turns the ignition to "start," the slider moves across the B+ terminal and connects with the ground terminal, starting the engine. . . .

(Ford MDL br. at 16). Defendant Ford's ignition switch expert, Dr. Subbaiah Malladi

of Failure Analysis Associates, offers the opinion that seven different stages must be reached before a fire could originate in these ignition switches: (1) electrically conductive copper fines are created in the area of the ignition switch; (2) the fines combine with grease to create a compound; (3) this compound fills the gap between the B+ terminal and the Minlon wall; (4) this conductive bridge erodes and degrades the wall; (5) this creates a short circuit between the B+ terminal and ground; (6) this short circuit heats the Minlon wall until the wall itself becomes conductive; and (7) the conductive path endures long enough for the conductive Minlon to grow sufficiently hot to inflame materials in the switch. (Malladi report at 8).[5] Dr. Malladi's theory suggests an ignition switch response environment that will vary markedly from vehicle to vehicle.

Defendants support the testimony of their automotive expert with the affidavit of a statistician, Dr. William Wecker. Dr. Wecker's affidavit provides further support for the contention that it is inappropriate to speak in terms of a class-wide ignition switch defect in this case. Using the existing data base of reported, unconfirmed incidents of steering column fires, Dr. Wecker studied the incidents reported in Ford's "Switch Incident Database," in which defendant Ford has recorded all instances of alleged steering column and ignition switch fires. Out of the 158 vehicle models/model years at issue in this litigation, Dr. Wecker found that 157

---

**5.** Dr. Malladi explains that at each of these stages the likelihood of fire originating in the switch will depend on factors that vary between Ford models and model years. For example:

● Step 1 (Copper fines): Copper particles are produced primarily by arcing. The number of particles produced depends on the size of the arc. In turn, the arc is dependent on components connected to the switch, which vary from vehicle to vehicle. Thus, some vehicles (Mark VII's, certain Econoline vans, certain 1988 Thunderbirds) produce little arcing, and thus very few copper particles. Malladi contends that no fires will originate in the switches of these vehicles. (*Id.* at 10).

● Step 2 (Formation of copper/grease compound): For a fire to occur, there must be enough of the grease/copper mixture to bridge the gap between the B+ terminal and the Minlon wall. Dr. Malladi discovered that different models contained different amounts of

grease. Thus, he concluded that the likelihood of ignition fire was greater in certain vehicles. (*Id.* at 19).

● Step 3 (Bridging of the gap): Whether the copper/grease compound actually fills the gap is also a function of the size of the gap between the B+ terminal and ground. Different Ford models and Ford cars made in different years have different gap-sizes. The likelihood of ignition fires is purportedly different in each of these cars. (*Id.* at 21).

As is made evident even in these few examples, it is possible that only relatively few of the plaintiffs in the proposed MDL class have operated cars in which there was an unreasonable risk of fire. Moreover, according to defendants, the risk of fire may be affected by the car operator's own conduct, such as the speed with which the operator generally turns the ignition switch. (*Id.* at 18).

had incident rates that are "statistically significantly different from at least one other model/model year." (Wecker aff. at 3). Moreover, there are "statistically significantly different reported incident rates between 4,484 model/model year pairs." (*Id.*). Some models/model years were found to be 75 times more likely to experience ignition switch failure than others, when one compares the highest and lowest rates of reported incidents. (*Id.*).

On its face, Dr. Wecker's analysis thus suggests that ignition switch failure causing fire is extremely rare overall, and that the vehicles involved in this case contain ignition switches with varying failure rates, based on analysis of the only currently available data. Arguably, some of those switches (specifically, those with higher failure rates for the model/year) may be termed "defective" under state law, while others may not be. Indeed, among certain models involved in this litigation, there are no reported ignition switch incidents at all. (*Id.*).

Plaintiffs argue that Dr. Wecker's findings should not be considered reliable because, as Dr. Wecker himself acknowledges in his affidavit, the Switch Incident Database includes unconfirmed reports and reports of incidents that may not be causally related to an ignition switch specifically. (*Id.* at 2). The court notes, however, that plaintiffs themselves have used the information in the Incident Database in making various arguments in this case, including plaintiffs' argument in *Wilks* that the "incident" class is sufficiently large to qualify for class certification. The court will accept Dr. Wecker's report for what it is worth, namely, to demonstrate that a detailed factual inquiry will be required for each of 158 model/years in this case, to determine whether each has the characteristics ascribed to it by the plaintiffs, or, at the very least, to explain what appear to be significant differences among the incidence rates of reported fires across the models and years at issue.

The court is not accepting or endorsing defendants' theories or evidence concerning the defect question. Rather, the court is merely acknowledging the issues that must be resolved at a trial on the merits of plaintiffs' claims, and determining whether these issues predominate over individual issues. Defendant Ford has demonstrated that even regarding the basic issue of defect, common issues will not predominate over issues affecting, at the very least, many subsets of class members. Indeed, the issues before the trier of fact in this case could vary greatly depending on the car model and the year, for reasons not yet understood.

Although the court agrees with plaintiffs' observation that defendant Ford has, on various occasions, described the ignition switches at issue as "the same" or "similar," this in itself does not establish common issue predominance. It is undisputed that the switches generally share a common design in that the positive terminal and the ground terminal are similarly positioned in each of the switches. Moreover, Ford's expert, Dr. Malladi, has identified a seven-step process, discussed above, in which the short circuit can occur, causing smoke and potentially fire, in the normal usage of the vehicle. However, the risk of malfunction and fire may be found by a factfinder to differ greatly from vehicle to vehicle or model/year to model/year. The general similarity between the switches does not necessarily mean, for example, that if the switch in the typical 1990 Ford Aerostar has an unacceptably high risk of being defective, then so has the switch in the typical 1987 Ford Tempo. Thus, the characteristics of the 158 model-years at issue would have to be determined.

It must be noted that the sweeping nature of Ford's 1996 recall is a factor favoring the predominance of classwide issues in this case. However, at the time of the recall, Ford officials explained to the National Highway Traffic Safety Administration ("NHTSA") that only some of the recalled vehicles could be viewed as defective: "A very small number of these vehicles may be susceptible to an internal short circuit which could potentially cause overheating, smoke, and possibly a fire...." (Ford Ex. 9). As is common and intended in automotive recall cases, the recall agreed to by Ford was broad-based and sweeping, in an attempt to ensure that all potentially dangerous vehicles would be included. *See* 49 C.F.R. § 573.5(c)(4) (recog-

nizing that in NHTSA recalls, only a percentage of recalled vehicles may actually contain a defective part). While the sweeping nature of the recall does not preclude Ford from contending in a legal suit for damages that its liability will turn on issues that affect each of these 23 million putative plaintiffs differently, Ford itself has grouped the recalled vehicles together for nationwide recall purposes.

The overall factual issue of whether these ignition switches are defective in design or manufacture must be acknowledged as a significantly narrower issue, with fewer permutations in individual cases, compared with issues such as whether silicone breast implants are likely to have caused certain diseases and conditions, or whether a physical condition found in class members was caused by exposure to second-hand tobacco smoke. It is principally the need for individualized determinations spanning 158 potential subclasses of model years that undermines factual issue predominance.

It may be possible, for example, after further discovery, that the 158 model years could be grouped into a few risk categories if a common trial were to be held, but plaintiffs have not come forward with a plan for doing so in a manner contesting Dr. Wecker's data base and findings. In the absence of a plan that would create mega-groupings within the proposed MDL subclasses, the court is left to be guided in this determination only by Dr. Wecker's opinion that the 158 subclasses are statistically unique from one another. If so, a plethora of such sub-subclasses would not solve the problems presented by lack of factual issue predominance.

■ Lastly, plaintiffs urge that Ford's arguments on the defect issue improperly require the court to evaluate the merits of the parties' underlying contentions in this case. The court disagrees. The court has not examined Ford's expert reports and other submissions with the intent of determining the likelihood of any of the parties prevailing at trial in this matter. Rather, the court has read those documents in order to determine the contours of the issues that would be involved in such a trial.[6]

6. Plaintiffs have moved to strike the affidavit of Dr. Wecker and the expert report of Dr. Malladi. Dr. Wecker's statistical analysis is flawed, according to plaintiffs, because Wecker himself regards the database as unreliable based upon the methods of collecting and categorizing anecdotal reports of steering column fires, plaintiffs challenge Dr. Malladi's report as an analysis of whether the subject ignition switches are defective, which should not be addressed in determining class certification. Plaintiffs cite the governing authority that class certification does not depend on the merits of the claims asserted, *see Eisen, supra; Finberg v. Sullivan,* 634 F.2d 50, 64 (3d Cir.1980); *Gardner v. Westinghouse Broadcasting Co.,* 559 F.2d 209, 212 (3d Cir.1977), *aff'd,* 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978); *Kirchgessner v. Wilentz,* 884 F.Supp. 901, 918 (D.N.J.1995), *aff'd,* 92 F.3d 1171 (3d Cir.1996) (Table) (but dismissing class allegations where underlying complaint was found to be without merit). This court has considered these preliminary opinions of Dr. Malladi and Dr. Wecker for a purpose which is both more limited than *assessing the merits of plaintiffs'* claims and also mandated in determining the issue of factual predominance, namely, assessing the evidentiary paths that a trial on the merits would likely traverse. Wecker indeed raises questions about reliability of the data plaintiffs have relied on to establish an incidence of risk, pointing to major disputes about the collection and assessment of the data and (if one assumes reliability) the necessity for splitting the proofs at

trial into individual model years, since grave disparities in data are revealed among model years by these data. Malladi's report illuminates significant factual distinctions among proposed ignition switch failure modes by pointing out the technical issues standing in the way of a determination that all 23 million switches are defective.

This court could not ignore Malladi's and Wecker's observations and still understand what a trial on the merits of plaintiffs' defect allegations will look like. Far from ignoring major factual disputes when considering certification, the Supreme Court has repeatedly recognized that such considerations are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982), quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) and *Mercantile Nat. Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963). Specifically, the "more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits...." *Coopers & Lybrand,* 437 U.S. at 469 n. 12, 98 S.Ct. 2454 n. 12, quoting 15 C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure* § 3911, p. 485 n. 45 (1976). The so-called "entanglement with the merits" is not to be confused with a weighing of the merits. The process instead involves delineation of the anticipated factual disputes while

■ The "common defect" issue takes on a different dimension in the *Wilks* case, since each of the estimated 2,000 potential class members would claim that a faulty ignition switch caused actual damage to their vehicle and, in some instances, to other property, too. It was on the basis of such reports of failures that Ford took broad-based action, recalling 248,000 Canadian vehicles in 1995 and 8.3 million vehicles in the United States in 1996. Thus, these anecdotal reports of steering column fires attributed to faulty ignition switches were vested with considerable weight by Ford itself. Ford has also posited the electrical and mechanical mechanism that can lead to a short circuit in the ignition switch and a fire over time, as set forth in the Failure Analysis Associates report of Dr. Malladi, above. For the potential members of the *Wilks* class, plaintiffs allege that this latent defect has become manifest and caused a fire. Although defendants have pointed out instances in which the cause of the vehicle fire in a particular vehicle was likely arson or some engine compartment problem rather than the ignition switch (which is mounted on the steering column in the passenger compartment), the predominant claim of the *Wilks* class lies in the manifestation of the switch defect. The *Wilks* plaintiffs, in contrast to the MDL plaintiffs, have made a considerably stronger showing of a predominant issue of defect. That some individuals in a *Wilks* class may not, in the end, fit this paradigm does not undercut the commonality of this aspect of their claim.

In conclusion, for the MDL plaintiffs, even as to the basic issue of defect, the issue that the plaintiffs have relied on in attempt to demonstrate "predominance" in this case, questions common to all putative class members do not predominate. For vehicles manifesting no defect, the answer to the defect question posed in this case conceivably might differ depending on the car model in question as well as the year in which the vehicle was manufactured, amounting to 158 sub-categories. For the *Wilks* case, on the other hand, the defective mechanism has allegedly manifested itself in each member's vehicle, suggesting a classwide predominance but pre-

senting individual issues of actual cause; but even the factual predominance of whether the *Wilks* class members' vehicle fires were caused by a faulty ignition switch cannot be answered in a legal vacuum, because of the plethora of plaintiffs' causes of actions under divergent state laws as discussed below. In addition, for both the MDL and *Wilks* classes, as will be discussed in detail *infra*, the answer to the defect question depends on which state's law applies to the claims of the plaintiff in question.

b. The Adjudication of Secondary Issues Such as Privity, Affirmative Defenses, and Reliance on a Class–Wide Basis

An analysis of issues in this case other than the defect issue further reveals the lack of truly class-wide issues that are implicated by plaintiffs' claims. For example, under the law of some states, for a plaintiff to prove an implied warranty claim, the plaintiff must demonstrate contractual privity with the defendant. *See, e.g., Flory v. Silvercrest Indus. Inc.*, 129 Ariz. 574, 633 P.2d 383, 388 (1981); *Osborne v. Subaru of Am., Inc.*, 198 Cal.App.3d 646, 243 Cal.Rptr. 815, 820–21 (1988). Plaintiffs from these states will have to prove that they purchased their Ford vehicle either from Ford itself or from one of its agents, as opposed to an independent car dealer or another individual. This will require the court to undertake an inquiry that will turn on facts particular to each individual plaintiff.

Similarly, with regard to plaintiffs' fraudulent concealment claims, plaintiffs generally may not prevail without proving the element of reliance. *See, e.g., Hanlon v. Thornton*, 218 Ga.App. 500, 462 S.E.2d 154, 156–57 (1995). That is, plaintiffs must persuade the finder of fact that disclosure of the allegedly dangerous nature of the ignition switches would have affected the purchaser's decision whether to purchase the vehicle. Obviously, this determination could not be accurately and fairly made on a class-wide basis, especially when even under plaintiffs' version of the facts the chance of these ignition switches ever causing a fire is relatively slim.

---

determining whether such disputes tend to be class-wide for the predominance analysis.

Therefore, plaintiffs' application to strike Malladi's and Wecker's opinions will be denied.

(*See, e.g.*, Ford *Wilks* Ex. 31 (testimony by plaintiff Gaubert that she "probably" would have purchased her Ford vehicle even if she knew that there was a one in one thousand chance of the vehicle catching on fire)). As the advisory committee comments to Rule 23 recognize, certification under Rule 23(b)(3) "may be unsuitable in fraud cases where there are variations in the kinds or degree of reliance by the persons to whom the alleged misrepresentations were addressed."

In addition, Ford explains that, with regard to some of the putative plaintiffs in this case, Ford would like to set forth individualized defenses such as comparative negligence. For example, Dr. Malladi states in his report that fire in the area of an ignition switch may be caused by changes made to the car's electrical system following the initial purchase. Malladi points specifically to the improper installation of an anti-theft device or stereo equipment. Some of the named plaintiffs in the MDL and *Wilks* cases have admitted to making such "after-market" changes to the electrical system of their car. (*See, e.g.*, Ford MDL Ex. 20; Ford *Wilks* Ex. 25). Ford is entitled to argue at trial that any unreasonably dangerous electrical condition or actual fire was caused at least partly by these plaintiffs themselves.

With regard to the *Wilks* case, the troublesome issues of causation may require special case-by-case measures that may render the *Wilks* case unsuitable for class certification. Plaintiffs have failed to suggest a reasonable plan for handling various concerns, such as the vehicles having installation of after-market equipment or in which the origin of the vehicles' fire was other than the steering columns, on a class-wide basis at trial.[7] Defendants contend that many of the fires that allegedly originated in the ignition systems of the *Wilks* plaintiffs actually originated in other areas of the car or were the product of arson, and were unrelated to any ignition

switch defect. Indeed, there is substantial evidence in the record that the fire in the car belonging to Michael Wilks himself was caused by an arsonist who used flammable liquids to start the fire. (*See* Ford *Wilks* Ex. 1).

The preceding discussion encompasses just a few of the issues in these cases that, at trial, would require the court to analyze facts particular to individual plaintiffs.[8] The number and significance of issues that affect different plaintiffs differently persuade the court that class-wide factual issues do not predominate.

### 2. Common Legal Issues Do Not Predominate

#### a. Choice of Law Considerations

At the threshold, the court must determine which law to apply to this action. Plaintiffs urge the court to apply the law of a single jurisdiction, which would alleviate the problems caused by variations in the laws of multiple jurisdictions. Defendants, however, argue that an application of the laws of all fifty states is required.

When a federal court exercises diversity jurisdiction, it must determine which state's laws to apply by reference to the forum state's law governing choice-of-law. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). In the typical diversity case, the court would look to New Jersey's choice-of-law analysis and determine which state's law governs some or all issues, from among two or three candidates. Likewise, in nationwide class actions, choice of law constraints are constitutionally mandated. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–23, 105 S.Ct. 2965, 2979–80, 86 L.Ed.2d 628 (1985). The parties before this court—whether members of the MDL subclasses or the *Wilks* class or the defendants—have a

---

7. Defendants argue that differences in individual vehicles arise from the different driving habits and usages among the classes. The court does not agree that such differences matter for class certification purposes. Whether the vehicles are driven long or short distances, whether the driver applies greater or lesser amounts of pressure in turning the ignition key, and other differing habits not amounting to abuse or destruction of the ignition mechanism, are all lawful and foreseeable behaviors that a non-defective switch must accommodate in everyday driving.

8. Other such issues include defendants' statute of limitations defense and plaintiffs' duty to provide proper notice of a breach of warranty claim.

due process right to have their claims governed by the applicable state law for their dispute. In the context of class certification, the Supreme Court has cautioned that the court "may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirements that there be a 'common question of law'". *Id.* at 821, 105 S.Ct. at 2979. The Third Circuit has similarly mandated that "the dictates of state law may not be buried under the vast expanse of a federal class action." *In re School Asbestos Litigation,* 789 F.2d 996, 1007 (3d Cir. 1986). More recently, the Third Circuit mandated "apply[ing] an individualized choice of law analysis to each plaintiff's claims." *Georgine,* 83 F.3d at 627. In diversity cases transferred under the Judicial Panel on Multidistrict Litigation, moreover, this court is to apply the choice of law rules of the transferor courts as to those incoming cases, *see Ferens v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (transferor state's law must be applied in § 1404(a) transfers); *In re Sunrise . Securities Litigation,* 698 F.Supp. 1256, 1261 (E.D.Pa.1988) (same for MDL § 1407 transfers), as well as the forum's choice of law rule for the cases originating here, thus further confounding the impulse to identify a single state's law to apply to all claims and defenses in a nationwide class action. Even confining our analysis to the conflict of laws rules of New Jersey, as the originating state for both the lead MDL case (*Veideman, supra*) and the *Wilks* case, quickly leads squarely into the thicket of the necessity of applying the law of fifty states if a nationwide class is certified, as now discussed.

■ New Jersey choice of law principles require an interest analysis, in which the forum court compares the interests of the states whose laws are potentially involved in the underlying action and determines which state has the greatest interest in having its law applied. *See Gantes v. Kason Corp.,* 145 N.J. 478, 679 A.2d 106 (1996). Plaintiffs argue that Michigan has the greater interest in having its law applied because Ford's headquarters are located in Michigan, the vehicles in question were manufactured there, decisions relating to the allegedly defective ignition switches were made there, and any misrepresentations, statements or advertisements regarding the Ford vehicles originated in Michigan. Further, plaintiffs claim that Michigan has an interest in regulating Ford's behavior and in making sure that it adheres to minimum levels of care expected of Michigan corporations.

Defendants maintain that a choice of law analysis leads to the conclusion that the laws of each plaintiff's home state must be applied because those states have interests that outweigh the interests of Michigan. The court agrees.

■ Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each state being the place in which plaintiffs reside, or the place in which plaintiffs bought and used their allegedly defective vehicles or the place where plaintiffs' alleged damages occurred.

While it might be desirable, for the sake of efficiency, to settle upon one state—like Michigan or New Jersey—and apply its law in lieu of the other 49 jurisdictions, due process requires individual consideration of the choice of law issues raised by each class member's case before certification. Since the laws of each of the fifty states vary on important issues that are relevant to plaintiffs' causes of action and defendants' defenses, the court cannot conclude that there would be no conflict in applying the law of a single jurisdiction, whether it be Michigan, or New Jersey, as the plaintiffs suggest. Thus, the court will apply the law of each of the states from which plaintiffs hail. This conclusion, of course, creates problems for class certification itself, as discussed below. *See Georgine v. Amchem Prods., Inc.,* 83 F.3d 610 (3d Cir.1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (individualized choice of law analysis for each plaintiff's claims in a nationwide class action led to proliferation of disparate factual and legal issues and a lack of predominant common issues).

### b. Variations in State Law

Plaintiffs have asserted five causes of action, arising under state law, on behalf of approximately twenty-three million owners of Ford vehicles which allegedly contain defective ignition switches. Since the court will be faced with the prospect of applying the laws of all fifty states, as required by *Erie R.R. v. Tompkins,* 304 U.S. 64, 78–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938), defendants argue that the differences in applicable state laws preclude a finding that common issues of law predominate in this case.

Plaintiffs correctly point out that the existence of state law variations is not alone sufficient to preclude class certification. *See, e.g., In re School Asbestos Litig.,* 789 F.2d 996, 1011 (3d Cir.1986), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986) (granting conditional certification of class while noting problem of manageability); *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 815 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) (overturning nationwide class settlement but noting that courts have certified nationwide class actions relying on capacity for court to decertify or redefine class subsequently if case becomes unmanageable).

In a motion for class certification, plaintiffs bear the burden of providing an "extensive analysis" of state law variations to determine whether there are "insuperable obstacles" to class certification. *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986) (citing *In re School Asbestos Litig.,* 789 F.2d at 1010). "If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action." *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996) (reversing certification of nationwide class in products liability case). "Prior to certification, the district court must determine whether variations in state law defeat predominance." *Castano,* 84 F.3d at 750. Plaintiffs argue generally that the differences in the state laws are trivial and few. Plaintiffs also assert that the class can be managed by grouping together jurisdictions whose laws contain similar variations. (Cabraser Decl. at ¶ 15).

As a blueprint for management of the class, plaintiffs provide two declarations from one of plaintiffs' counsel, Elizabeth Cabraser, relating how similar claims have been tried in *Naef v. Masonite Corp.,* No. CV–94–4033 (Ala. Cir. Ct. Mobile Co.). In that case, the state court certified a nationwide class and decided to conduct a multiple phase trial, ostensibly under the laws of fifty-one jurisdictions. Notably, the Eastern District of Louisiana was asked to certify a nationwide class in a nearly identical MDL suit, *In re Masonite Corp. Hardboard Siding Products Liability Litig.,* 170 F.R.D. 417, 421–25 (E.D.La.1997). That court denied plaintiffs' motion for certification, concluding that differences in the applicable state substantive laws overwhelmed common elements in the plaintiffs' claims. *Id.* at 421–23. *See also Castano v. American Tobacco Co.,* 84 F.3d 734, 741 (5th Cir.1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance.").

In fact, the parties agreed at the time of oral argument on this motion that no federal court had tried a class action which would require the application of the laws of fifty-one jurisdictions. Since then, plaintiffs have directed the Court's attention to the decision of Judge Wolin in *In re Prudential Insurance Co. of America Sales Practices Litigation,* 962 F.Supp. 450 (D.N.J.1997), which certifies a nationwide class of eight million consumers who purchased life insurance policies from Prudential. Although the *Prudential* case nominally contemplates the application of the laws of fifty-one jurisdictions, the decision to certify was made in the context of a proposed settlement of a putative class action, and certification was not strenuously opposed, as it is here, by the defendants. Indeed, Prudential joined in the motion for class certification as part of the overall negotiated settlement.

Further, Judge Wolin relied on the submission by plaintiffs of a detailed analysis of state law variations, concluding that

plaintiffs' claims can be grouped into a manageable number of categories accommodating any variations in the elements of the potentially applicable states' laws. And, the Court finds that a manageable number of jury instructions could be fashioned to comport with the elements of the common law claims in the many jurisdictions.
*Prudential,* 962 F.Supp. at 525. The plaintiffs in *Prudential* also submitted sample jury instructions and special verdict forms to illustrate that variations among potentially applicable state laws can be managed to permit a fair and efficient adjudication by the fact finder at trial. *Id.* at 525 n. 49. Where a settlement-only class certification is being considered, the court contemplating certification of a Rule 23(b)(3) class "need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial," as the Supreme Court recently noted in *Amchem Products, Inc. v. Windsor,* —— U.S. ——, ——, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). Thus, although the fact that a manageable number of issues could have been distilled into a common trial if the matter had been litigated rather than settled buttresses Judge Wolin's conclusion that class certification for settlement was appropriate in the *Prudential* case, such a finding may be unnecessary in the settlement-only class certification.

In this case, however, plaintiffs have not submitted sample jury instructions or verdict forms necessary to demonstrate a trial blueprint. Moreover, aside from informing the court of the example of the *Naef v. Masonite* state court case, *supra,* plaintiffs have made no effort to suggest a plan regarding how the present case could be handled in a manageable way in view of the necessity to apply the laws of fifty-one jurisdictions.[9] For example, despite plaintiffs' burden to provide an "extensive analysis" of state law variations, they have not explained how their multiple causes of action could be presented to a jury for resolution in a way that fairly represents the law of the fifty states while not overwhelming jurors with hundreds of interrogatories and a verdict form as large as an almanac. Plaintiffs might have attempted to frame their legal claims in such a way as to establish the predominance of common questions by stepping aside from state law labels and looking instead to the primary issues underlying those labels. Alternatively, plaintiffs might have seized upon the Court's suggestion to reduce or simplify the case by dropping those causes of action deemed less important by plaintiffs. Instead, however, plaintiffs have essentially asked the court to certify this class on the basis of mere promises that a manageable litigation plan can be designed in this case for five causes of action under the law of fifty-one jurisdictions as the litigation progresses. This court declines to certify this class action on the basis of such a slender reed. Because the plaintiffs have the burden of designing a workable plan for trial embracing all claims and defenses prior to class certification, "a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome." *Castano,* 84 F.3d at 742; *accord, Andrews v. American Telephone & Telegraph Co.,* 95 F.3d 1014, 1023 (11th Cir.1996).

While it has been possible in other product liability cases to regroup the applicable laws of the fifty states into (for example) four general patterns providing an accurate pattern for subclass groupings by state, *see In re School Asbestos Litigation,* 789 F.2d at 1011, *see also In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d at 817–18 (expressing no reason to doubt such a regrouping of fifty states' laws could be done), plaintiffs have not done so here.

Defendants have provided a comprehensive appendix detailing the variations among the states' laws on strict liability, breach of express and implied warranty, fraud, and

---

9. The *Naef* case, while an example of an ambitious attempt to try the issues of defectiveness and breach of warranty under the law of 51 jurisdictions, is not an attractive example. In the portion of trial completed in 1996, there was uncertainty as to the meaning of the "abstruse interrogatory responses" from the Naef jury, in the view of the federal court in *In re Masonite Hardboard Siding Prod. Liability Litigation,* 170 F.R.D. 417, 419 (E.D.La.1997).

consumer protection acts. (*See* "State Law Variations Appendix"). Defendants catalogue a number of differences concerning several aspects of each of the causes of action, including the divergence of the majority of states from the law of this forum state on many key issues. For example, regarding plaintiffs' strict liability claim alone, defendants point to at least five different approaches to defining a "design defect;" differing positions as to whether the "economic loss doctrine" precludes strict liability actions; differing views as to whether physical harm is a prerequisite to bringing a cause of action; different warning requirements; and different affirmative defenses. Defendants have likewise demonstrated a multitude of different standards and burdens of proof with regard to plaintiffs' warranty, fraud and consumer protection claims.

Viewing these variations in the context of a case involving five state-law causes of action, the laws of fifty states, and over twenty-three millions plaintiffs, the court must conclude that this suit cannot be practically and efficiently tried as a class action because plaintiffs have not established a predominance of common legal issues as required by Rule 23(b)(3). *See Georgine,* 83 F.3d at 618 ("[E]ach individual plaintiff's claim raises radically different factual and legal issues from those of other plaintiffs. These differences, when exponentially magnified by choice of law considerations, eclipse any common issues in this case. In such circumstances, the predominance requirement of Rule 23(b) cannot be met."); *In re Ford Motor Co. Bronco II Product Liability Litig.,* MDL No. 991, 1997 WL 86337 (E.D.La. Feb. 27, 1997) (refusing to certify class on "record that reflects so many variations in state laws that common questions of law clearly cannot be said to predominate for purposes of Rule 23(b)(3)"); *In re Masonite Hardboard Siding Litigation, supra,* 170 F.R.D. at 422–24 (rejecting proposal for "defect only" trial because "composite instructions accounting for all of these differences would hazard a chaos that seems counterintuitive to the spirit of Rule 23").

**B. The Alleged Superiority of the Class Action over other Means of Adjudicating this Controversy**

■ The second requirement of Rule 23(b)(3) is that the putative class representatives demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The putative class representatives must satisfy both the predominance and the superiority requirements in order to be successful on their class certification motion. The court concludes that even if plaintiffs could have satisfied the predominance requirement, their class certification motion would fail on the basis of the superiority requirement.

■ Concededly, this question is a close one. In general, it is desirable to litigate similar, related claims in one forum. That interest is especially significant in cases such as the MDL case, in which the recovery being sought by each of the plaintiffs is not sufficiently large to render individualized litigation a realistic possibility. *See, e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 2973, 86 L.Ed.2d 628 (1985).

On the other hand, plaintiffs' efficiency-based arguments on this point begin to lose their force as one attempts to plan the post-certification trial of plaintiffs' claims. As discussed previously, there are numerous factual issues in this case that cannot be adjudicated on a class-wide basis, and even the governing law will vary from plaintiff to plaintiff. If there existed only a limited number of issues for which there could be no class-wide resolution, the court could perhaps certify these cases as class actions and then take steps to alleviate the problems raised by these issues. For example, the court could certify various subclasses or conduct bifurcated trials consisting of one class action and various ensuing individual trials. *See, e.g., In re School Asbestos Litigation,* 789 F.2d at 1008–09 (explaining that mere fact that damages may not be assessed on class-wide basis should ordinarily not preclude certification of class).[10]

**10.** Two hypothetical approaches to the MDL sub-

class problem, neither of which seems satisfacto-

As things now stand, it is apparent that appropriate adjudication of the issues in the MDL case would require an unduly large number of subclasses that would divide up the plaintiffs by, among other factors, vehicle model, model year, and the law that governs their claims. When one considers plaintiffs' vehicles in terms of the differing models and model years, there are 158 separate types of vehicles involved in this litigation. In view of the need to consider the laws of 51 different jurisdictions, at the outset potentially over 8,000 subclasses might be needed to effectively try the MDL case as class actions. Further complicating any trial would be the fact that plaintiffs have raised five separate state law causes of action, and have thus far failed to simplify their claims in order to compress the differences in applicable state law. Moreover, this subdivision into potentially 8,000 subclasses would itself fail to take account of issues that apply only to particular plaintiffs, such as the after-market accessories installed on that plaintiff's electrical system.

In short, the court perceives that, if certified as presently proposed, this case would quickly devolve into an unmanageable morass of divergent legal and factual issues. See Fed.R.Civ.P. 23(b)(3) (noting that court evaluating superiority class action device in given case should consider "the difficulties likely to be encountered in the management" of the class action). Moreover, such divergent issues are sufficiently numerous to negate any efficiencies brought on by the use of the class action device in this case. The court notes that these "manageability" problems would be particularly acute in the MDL case, which includes a putative class of over 23 million plaintiffs, nearly ten percent of the population of this country, none of whom have, by definition, suffered damage from the ignition switch in their Ford vehicle.

Similarly, bifurcating this case for the purpose of resolving more general issues in class form would not alleviate the problems that the court perceives. If there were certain basic issues (such as defect) to which only one state's laws applied and concerning which class-wide issues predominated, the court could consider certifying a class with respect to those issues only. See Fed. R.Civ.P. 23(c)(4). As discussed previously, however, even as to basic issues of defect, class-wide resolution appears inappropriate in this case.

The court's analysis in this area would have been aided by a realistic, specific proposal by plaintiffs concerning how subclasses could be constructed in this case. The MDL plaintiffs, however, have insisted that only two subclasses are needed: 1) plaintiffs whose cars have been recalled and 2) plaintiffs whose cars have not been recalled. Without the aid of a more realistic proposal, the court has taken an independent review of the possibilities of subclasses and bifurcation, and it has concluded that such remedies could not be used to render this case appropriate for class certification in a federal forum.

If class treatment of plaintiffs' MDL claims is possible at all, perhaps it could be handled on a state by state basis. See Georgine, 83 F.3d at 634 (suggesting such a resolution). For example, the issues in the MDL case would become more manageable if the case involved only those plaintiffs whose claims are governed by New Jersey law and if plaintiffs reduced the 158 model-years into

---

ry, come to mind. First, 158 subclasses could be created, one for each model/year at issue. The jury would determine a threshold issue, such as whether there is an unacceptable risk of property damage due to the ignition switch of each subclass. If the answer is "no," it is difficult to foresee that any further facts would have to be found for that subclass. If the answer is "yes," the more detailed analysis required by the law of the 50 states would still be required for that subclass. Even if the laws of the 50 states could themselves be subgrouped and refined to perhaps a dozen general categories for purposes of trial, and even if plaintiffs voluntarily dismissed cer-

tain claims that would require a more individualized factual inquiry, the jury's task would be just about impossible. As a second approach, plaintiffs could refine all claims to catch the essence of the relief sought for these undamaged, potentially defective vehicles, such as the replacement of the ignition switch or an equivalent amount of money to enable the consumer to do so; plaintiffs would refashion the causes of action to emphasize the commonality of claims around this generic inquiry. Whether these refined general issues could be presented on a classwide basis is unknown, and plaintiffs have in any event presented no blueprint for doing so.

perhaps a half dozen groups of vehicles having similar risks of switch failure.

██ With regard to the *Wilks* plaintiffs, case by case adjudication of plaintiffs' claims would also appear to be a superior method of adjudication as matters now stand. Those plaintiffs whose cars have allegedly sustained smoke or fire damage would apparently have suffered sufficient damages to make individualized litigation economically feasible. Indeed, according to Ford, over one hundred individual lawsuits or subrogation claims have been brought arising from the alleged ignition switch fires. Such case by case litigation would guarantee proper attention to each of the individual issues at stake in the case.

There are also administrative remedies that are available to plaintiffs in the MDL cases that are superior to the nation-wide class action suit that plaintiffs have attempted to bring. Specifically, the Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et seq.*, gives NHTSA the authority to investigate complaints concerning automobile defects and to order a recall where appropriate. Any "interested person" may file a petition with the Secretary of Transportation to initiate proceedings aimed at determining whether a recall would be appropriate. 49 U.S.C. § 30162(a)(2). In the MDL case, 23 million plaintiffs seek relief for an alleged defect that has not yet manifested itself or caused damage in their vehicles. The court is convinced that in such a situation, the administrative remedy provided by NHTSA, including recall of vehicle for inspection and/or repair, is more appropriate than civil litigation seeking money damages in a federal court. The court concludes that there is insufficient justification to burden the judicial system with plaintiffs' claims while there exists an administrative remedy that has been established to assess the technical merits of such claims and that can handle those claims in a more efficient manner by ordering further recall and replacement of the ignition switch, if appropriate.

██ The court recognizes that the Motor Vehicle Safety Act and NHTSA itself do not in any way preempt a plaintiff's right to bring common law claims against the manufacturer of an allegedly defective part. *See* 49 U.S.C. § 30103. The court is also aware of the statutory limitations of NHTSA in this area, especially the inability of NHTSA to recall vehicles that are more than eight years old. *See* 49 U.S.C. § 30120(g)(1). The court also has taken note that twenty-five years ago the Third Circuit questioned, in dicta, whether Rule 23 was "intended to weigh the superiority of a class action against possible administrative relief." *Amalgamated Workers Union v. Hess Oil Virgin Islands Corp.,* 478 F.2d 540, 542–43 (3d Cir.1973). In fact, the *Amalgamated* court tentatively concluded that the superiority requirement "was intended only to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit." *Id.* at 543. On the other hand, this court is not bound by dicta, and research reveals that the *Amalgamated* court's views on this topic are not universally held. *See, e.g., Pattillo v. Schlesinger,* 625 F.2d 262, 265 (9th Cir.1980); *American Suzuki Motor Corp. v. Superior Court,* 37 Cal.App.4th 1291, 44 Cal.Rptr.2d 526, 531 (1995); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1779 at 561–62 (2d ed.1986) (criticizing *Amalgamated* as constituting an "overly restrictive reading" of Rule 23 and as being at odds with the purposes behind the superiority requirement). At any rate, the court does not deny certification in these cases merely on the basis of the existence of NHTSA. The court has mentioned the availability of a NHTSA remedy issue only to demonstrate that issues such as those involved in this MDL case are likely to be more efficiently resolved by administrative action as opposed to a nation-wide, federal court class action adjudicating the rights of ten percent of the population of this country who own the 23 million Ford vehicles that have not manifested a problem.

Under all these circumstances, class certification is also not superior to the alternative that this court will adopt—judicial control over coordinated discovery on all common issues so that the transferred cases can be prepared for return to the transferor dis-

tricts for trial under 28 U.S.C. § 1407(a), as discussed in Part IV, below. Likewise, the *Wilks* and *Art's Transportation* cases, filed within the original jurisdiction of this court, will go forward upon the individual claims asserted therein.[11]

## II. *Rule 23(b)(1)(A) Class Action*

Plaintiffs alternatively seek certification under Fed.R.Civ.P. 23(b)(1)(A), which provides:

> An action may be maintained as class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class....

Plaintiffs invoke this provision in summary fashion, and offer minimal argument in support of their motion for certification under this Rule.

■ The court concludes that certification would not be appropriate under this provision. There is nothing in the record that indicates that prosecution of separate actions in this case would create a significant risk of inconsistent adjudications or establish inconsistent standards. This case is substantially about defendants' potential obligation to pay monetary damages or repair certain vehicles. Defendants would be not required to adopt inconsistent conduct by paying damages to, or repairing the vehicles belonging to, only some of the putative plaintiffs in this action. Although the complaint does contain a prayer for certain declaratory and injunctive relief, certification under Rule 23(b)(1)(A) does not appear appropriate in this case in which the claim for monetary damages is such a prominent aspect of the relief that plaintiffs seek. *See Pruitt v. Allied Chem. Corp.*, 85 F.R.D. 100, 107 (E.D.Va.1980) (citing *McDonnell Douglas Corp. v. United States District Court*, 523

F.2d 1083 (9th Cir.1975)). Moreover, Rule 23(b)(1)(A) "is designed to protect the interests *of the party opposing the class.*" *Id.* at 106 (emphasis added). The fact that defendants are not seeking to invoke the protection of the rule further indicates that that provision is inapposite here. *See id.* at 106–07. Further, the *Wilks* plaintiffs' argument for Rule 23(b)(1)(A), as means for compelling the recall of all Ford vehicles, makes no logical sense for the *Wilks* class because their vehicles have allegedly already been burned and are either already repaired or not functional. The court's conclusion in this area is further confirmed by plaintiffs' lack of attention given to Rule 23(b)(1)(A) certification in their brief. Since plaintiffs have the burden of establishing the appropriateness of class certification, this court will not certify a class of 23 million plaintiffs on the basis of conclusory arguments by the moving party.

## III. *The Conditional Certification Option*

■ Rule 23(c)(1) provides that an order granting class certification "may be conditional, and may be altered or amended before the decision on the merits." Perhaps because of the somewhat provisional nature of a grant of certification, courts have stated that in close cases, all doubts should be resolved in favor of class certification. *See, e.g., Peil v. National Semiconductor Corp.*, 86 F.R.D. 357, 364 (E.D.Pa.1980). In this case, however, the court has considered these authorities and has discerned insufficient justification to certify this case even on a conditional basis.

If plaintiffs had come forward on their certification motions with a realistic plan of how this case could be tried to a jury, the conditional certification option might have been a more appealing one to the court. The court is somewhat tempted to certify this case conditioned upon plaintiffs' ability to present such a plan, along with an explanation of the best way to present to a jury five causes of action under the law of fifty one separate jurisdictions. A review of Rule 23 and the purposes underlying that rule, how-

---

**11.** Indeed, all pending dismissal motions in the MDL and *Wilks* cases will be adjudicated very

shortly in a forthcoming opinion.

ever, reveal that such conditional certification would be inappropriate here. The obligation to demonstrate that a case could be manageably litigated in class action form is a basic requirement of Rule 23(b)(3), and is stated explicitly in the text of that provision. These consolidated cases have been before this court for a year, and discovery has been proceeding for months. Yet, plaintiffs have not satisfied this fundamental requirement of suggesting a feasible means by which these cases could be tried as class actions. Nor have plaintiffs taken any steps in furtherance of the court's suggestion to reduce or simplify their claims to make certification a feasible option. Thus, this is not a case in which some peripheral details need to be resolved before trial takes place. Rather, conditional certification on the basis of this record would represent a holding that although plaintiffs have failed to satisfy the basic requirements of Rule 23 after months of discovery and countless pages of briefing, these huge classes should nonetheless be certified.

Thus, in view of the history of this litigation as well as the prospects of plaintiffs ever designing a feasible plan to litigate these cases on a class basis, the court will issue an order denying class certification. In reaching its decision, the court has noted Rule 23's admonition to resolve the certification issue "[a]s soon as practicable after the commencement of [the] action." The court has also been persuaded by those authorities that explain that even conditional certification orders "should not be treated as tentative" or be employed simply to defer a final ruling on the certification issue. Federal Judicial Center, *Manual for Complex Litigation Third* §§ 30.11, 30.18 (1995). As the *Manual for Complex Litigation* explains:

> Undesirable consequences may follow when an expansive class, formed on insufficient information, is later decertified or redefined. Substantial time and expense may be wasted on discovery with respect to matters affecting persons who are later excluded. Those eliminated from the litigation as a result of decertification or reduction in the size of a class may be confused at best or prejudiced at worst.

> \* \* \* \* \* \*

> Once [a certification order] is issued, the parties can be expected to rely on it and conduct discovery, prepare for trial, and engage in settlement discussions on the assumption that in the normal course of events it will not be altered except for good cause.

*Id.* §§ 30.11, 30.18. The court will not conditionally certify these cases on the basis of a hope that at some point plaintiffs may find a feasible, realistic way to bring these cases to trial in class form.

This court acknowledges throughout this opinion that these motions do not involve an all-or-nothing approach to certifying a national class. Even though these actions cannot be certified as proposed, the court has made suggestions for dividing the class into geographic and model/year subclasses, if feasible, as discussed in *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d at 818. Among other things, a court denying class certification should also consider "allowing the case to continue as a multi-district litigation for the remainder of pre-trial discovery," *id.,* and this will be done.

Despite the fact that no class will be certified, this court still maintains control over the pretrial proceedings in the individual suits that have been transferred and consolidated here by virtue of the order of the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407(a). The parties should now focus their attention on conducting coordinated discovery so as to realize the benefits of having all cases, parties and counsel in these related matters before a single judge. *Manual for Complex Litigation (Third),* § 31.132. Dispositive motions presently pending in this court are also being decided. Following completion of multi-district common discovery, the MDL cases will be remanded to the transferor courts from whence they came for further individual case discovery, dispositive motion practice and trial, if necessary. 28 U.S.C. § 1407(a) (actions transferred by the judicial panel on multidistrict litigation shall be remanded at or before the conclusion of pretrial proceedings). The *Wilks* and *Art's Transportation* cases will also go forward upon this court's docket to

adjudicate the claims of all named plaintiffs properly venued in this district.

On the other hand, if plaintiffs in the MDL case or in *Wilks* are able to reformulate pleadings and class definitions so that a suitable blueprint for trial emerges, in accordance with this opinion, plaintiffs may renew their class certification motion.

### Conclusion

The court declines to certify these cases as class actions under either Rule 23(b)(3) or Rule 23(b)(1)(A). Certification under the former provision is inappropriate here because plaintiffs have failed to demonstrate that, in these cases, "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." As to Rule 23(b)(1)(A), plaintiffs have not persuaded the court that "the prosecution of separate actions by or against individual members of the class would create a risk of ... inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." If plaintiffs in the MDL cases or in *Wilks* can cure the noted shortcomings, they may apply for appropriate class certification.

The accompanying order is entered.

### ORDER

This matter having come before the court upon the plaintiffs' motions for class certification in the above-captioned cases; and the court having considered the submissions of the parties; and the court having heard oral argument on the motions on March 14, 1997; and having considered the supplemental post-hearing submissions, and for the reasons stated in the Opinion of today's date;

IT IS this 28 day of August 1997 hereby

ORDERED that plaintiffs' motions for class certification in the above-captioned cases are hereby **DENIED** without prejudice

to renewal consistent with the Opinion herein.