Carl J. MARASCALCO, O.D.,
et al., Plaintiffs,

v.

INTERNATIONAL COMPUTERIZED ORTHOKERATOLOGY SOCIETY, INC., et al., Defendants.

No. 3:96CV163–S–A.

United States District Court,
N.D. Mississippi,
Western Division.

Sept. 2, 1998.

Goodloe Lewis, Hickman, Goza, & Gore, Oxford, MS, Jay Gore, III, Hickman, Goza & Gore, Grenada, MS, for plaintiffs.

John Ryder, Apperson Crump Duzane & Maxwell, Memphis, TN, for International Computerized Orthokeratology Society, Inc. and J. Mason Hurt, O.D., Individually.

Brian T. Feeney, J. Gordon Cooney, Jr., Morgan, Lewis, & Bockius, Philadelphia, PA, C. Jackson Williams, Dunbar Williams, PLLC Oxford, MS, for Alcon Laboratories, Inc.

*OPINION*

SENTER, Senior District Judge.

Presently before this court is the plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. The named plaintiffs include practicing optometrists from the states of Mississippi, Kentucky, Montana, California, Colorado, Arizona, Missouri, New Mexico, Florida, Georgia, and Illinois who bring claims for breach of contract, breach of warranty, fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and who seek damages ranging

from $21,000 to $5,732,750.00 individually.[1] Of the thirteen named defendants, only three, International Computerized Orthokeratology Society, Inc. (hereinafter "ICOKS"), J. Mason Hurt, and Alcon Laboratories, Inc., have sought to oppose the motion for class certification.[2]

## FACTS

In 1994, Dr. J. Mason Hurt, a Memphis optometrist, began to market a procedure known as Precise Corneal Molding or PCM which would allegedly allow myopia patients the benefit of corrected vision without the use of glasses or contacts. PCM involves non-surgical reshaping of the cornea through the use of molds and is based on orthokeratology, a process developed in 1962 which uses rigid gas permeable lenses for corrective eye care.[3] Vital to the PCM procedure is the corneal topographer, a computerized machine which measures the curvature of the cornea.[4] Although not vital to PCM, another piece of equipment, the ReSeeVit, manufactured by Veatch Opthalmics, was recommended to further enhance Dr. Hurt's process.

The first efforts to promote PCM centered on seminars in Houston, Texas. The sponsor of the Houston seminars is unclear to the court. The plaintiffs allege Alcon Laboratories as the sponsoring entity while Dr. Hurt maintains that the International Computerized Kerato–Reformation Society ("ICKRS"), not a party to this action, was the sponsoring entity for the Houston seminars. According to Dr. Hurt, he founded ICKRS with Dr. Sami El Hage from Houston, Texas, another unnamed party whose role remains a mystery. What is clear is that optometrists were invited to attend seminars in Houston, Texas where, after submitting a $2,000.00 attendance fee, the potential customers were informed of the benefits of the procedure and instructed as to the requirements necessary to incorporate PCM into their practices.[5] That Dr. Hurt and Dr. El Hage spoke at the seminars is not disputed by the defendants. Defendant Sam Cooper, a marketing consultant, conducted presentations on the marketing of the procedure. Also in attendance at the seminars were representatives of Alcon Laboratories, manufacturer of the topographer, representatives of Metro Optics, manufacturer of the molds, and representatives of Veatch Opthalmics, manufacturer of the ReSeeVit.[6] Seminars were also held in Memphis.[7]

According to the plaintiffs, Dr. Hurt "promised to teach the attendees the [PCM] procedure provided that the optometrists (1) joined the International Ortho–Keratology

1. Each plaintiff seeks $5,732,750.00 to cover the loss of the benefit of the bargain for the defendants' alleged breach of the marketing agreement.

2. Entries of default have been entered against the remaining defendants, CKR Media Fund, Inc., CKR Media Fund Financial Services aka Americorp, PCM Media Fund, Inc. aka PCM Media Fund, L.L.C., Media Fund Management, Inc., Diversified Capital Corp., Sonny Poole, Sam H. Cooper, PCM Holdings, L.L.C., PCM Laboratories, L.L.C., and PCM Clinics & Practice Management, L.L.C.

3. While ortho-keratology is an existing procedure employing the therapeutic use of contact lenses for corrective eye care, it appears that the plaintiffs' primary complaint with the PCM process is their contention that Dr. Hurt made "gross exaggerations as to the efficacy and effectiveness of the procedure, as well as the amount of income which could be made performing the procedure."

4. The corneal topographer photographs the entire corneal surface and transmits the information through a color coded display which is then used to diagnose or monitor visual function. The corneal topographer is not singularly limited to PCM use but, instead, is beneficial in other procedures such as diagnosing corneal disease or fitting contact lenses.

5. Defendant Hurt alleges neither he nor ICOKS received any of the Houston seminar fees but, instead, Dr. El Hage collected the $2,000.00 fees. As stated, the plaintiffs have not named Dr. El Hage or ICKRS as defendants nor do they draw any distinction between the two societies (ICKRS and ICOKS) or between the two seminars (Houston, Texas and Memphis).

6. The plaintiffs have not named either Metro Optics or Veatch Ophthalmics as defendants.

7. Dr. Hurt states that he and Dr. El Hage had a dispute which resulted in Dr. Hurt relocating the seminars to his home town of Memphis and forming a new society, ICOKS.

Society (ICOKS),[8] and paid an attendant membership fee,[9] (2) paid a fee of $5,000.00, plus $350.00 per referred patient, to defendants CKR Media Fund, Inc. and/or PCM Media Fund, Inc. for marketing services, and (3) leased or purchased an Alcon EH–290 Corneal Topographer for over $21,000.00." According to the plaintiffs, Hurt told the optometrists that the only way they could purchase the molds [10] for treatment of patients was by joining ICOKS.[11] Therefore, the only way to perform PCM would be to join the society and comply with its membership terms. Furthermore, Dr. Hurt allegedly represented that a lower price had been arranged for the Alcon topographer for members of ICOKS.[12]

### ALLEGED LIABILITY

In addition to the foregoing, the plaintiffs allege that Dr. Hurt was an agent of Alcon and that representations were made by Alcon through its employees and agents that the topographer was (1) reasonably suited for its designated use, (2) that Alcon would provide free parts, service and upgrades for the instrument, (3) that the plaintiffs would be able to lease the topographers for a special low price and (4) that the topographer would be compatible with the ReSeeVit. The plaintiffs complain that they have not received the free parts, service and upgrades as promised; that the topographer has not performed at the represented level; and that the topographer is not compatible with the ReSeeVit. The plaintiffs bring claims against Alcon for breach of both express and implied warranties.·

Additionally, the plaintiffs allege that through the required marketing agreement, Dr. Hurt and Cooper promised to provide ICOKS members with 5,000 patients for the PCM procedure through extensive media marketing promotions, including a $250,-000.00 national advertising campaign, a personalized "infomercial," and the expenditure of $50,000.00 in local media promotions. According to the plaintiffs, the defendants failed to provide the marketing services as promised and, therefore, breached the marketing agreement.

The plaintiffs allege that Alcon, Hurt, and others engaged in a conspiracy to defraud the plaintiffs by inducing them to enter the marketing and topographer lease agreements through misrepresentations.[13] In support of the conspiracy claim, the plaintiffs assert that Alcon paid Dr. Hurt and/or ICOKS undisclosed "commissions" for each of the leases secured through Dr. Hurt's program. The plaintiffs further allege that Alcon, through its name and reputation, induced the plaintiffs into joining ICOKS. Finally, the plaintiffs allege violation of RICO by stating that the defendants devised a scheme to defraud through the use of the mail/wires by inducing the plaintiffs to join ICOKS, pay CKR (PCM) Media Fund for marketing services never delivered, and to purchase or lease the topographers.

The named plaintiffs as class representatives seek certification pursuant to Federal Rule of Civil Procedure 23 with defined classes as follows:

(1) All optometrists who were fraudulently, or through intentional or negligent misrepresentation, induced to join ICOKS and/or enter into the CKR (PCM) Marketing Agreement who· did not receive the media

---

**8.** As stated, the plaintiffs have not drawn a distinction between ICOKS or ICKRS.

**9.** The plaintiffs state that the fee was $2,000.00 although some members paid less.

**10.** Apparently, there is some distinction between the PCM molds and the lens (or molds) used in ortho-keratology.

**11.** Hereinafter, for purposes of the recitation of facts in this opinion, the court chooses to follow the plaintiff's lead and not draw a distinction between the two societies.

**12.** The plaintiffs allege that Hurt and Alcon reached an agreement which led Hurt to inform the plaintiffs that the Alcon topographer was the only topographer that could be used for the procedure and that the plaintiffs would not be allowed to use topographers manufactured by other companies.

**13.** The plaintiffs admit that some of the ICOKS members purchased the Alcon topographer rather than opting to lease.

services or 5,000 buyers of the PCM procedure as promised.

(2) All optometrists who were fraudulently, or through intentional or negligent misrepresentation, induced to enter into the topographer lease or purchase agreements with either CKR Financial Services, another company or Alcon, who have not received the benefit of their bargain.

(3) All persons who suffered damages from breach of warranty by CKR Financial Services, Alcon or another company for the topographer.

(4) All optometrists damaged by Alcon's failure to provide free parts, service and upgrades.

(5) All optometrists who suffered damages under RICO from the defendants.

The plaintiffs intend that these classes should be confined to only those optometrists who attended one or more of the ICKRS/CKR or ICOKS seminars and were members of ICOKS.

## DISCUSSION

■ For purposes of class certification, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). However, a district court may look past the pleadings to determine whether the requirements of Rule 23 have been met. *Castano v. American Tobacco,* 84 F.3d 734, 744 (5th Cir.1996). "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.*

■ While the decision to certify is within the broad discretion of the court, that discretion must be exercised within the framework of Rule 23. *Gulf Oil Co. v. Ber-*

*nard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). That framework includes perusal of the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation as well as of the category or categories the proposed class has elected under Rule 23(b). Fed.R.Civ.Pro. 23. A district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Castano,* 84 F.3d 734, 740; *Applewhite v. Reichhold Chemicals,* 67 F.3d 571, 573 (5th Cir.1995). The burden rests with the plaintiffs at all times to show that the requirements have been met. *Id.; In re American Medical Systems,* 75 F.3d 1069 (6th Cir.1996).

As stated, a class action may be maintained only if the prerequisites of Rule 23(a) have been met in addition to establishing either Rule 23(b)(1), (2), or (3). The plaintiffs contend their class action is certifiable under either Rule 23(b)(3) or Rule 23(b)(2). For the following reasons, this court finds that the plaintiffs have failed to meet their burden under Rule 23(b). Therefore, the court need not discuss whether the plaintiffs satisfy the requirements of Rule 23(a).[14]

Rule 23(b) provides:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or

---

14. (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.Pro. 23(a).

impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.Pro. 23(b).

### RULE 23(b)(2)

Rule 23(b)(2) clearly allows certification for claims in which the only remedy sought is injunctive or declaratory relief. It does not necessarily limit certification to cases where the sole remedy is injunctive or declaratory relief. *Pettway v. American Cast Iron Pipe*, 494 F.2d 211, 257 (5th Cir.1974). However, Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.Pro. 23(b)(2) (Advisory Committee Notes); See, *Johnson v. General Motors*, 598 F.2d 432, 437 (5th Cir.1979). Under this category of Rule 23(b), the plaintiffs request "specific performance of the Topographer lease agreement and any other oral contracts which may exist thereunder" and a declaration that defendants have breached the marketing agreement, that defendants have breached the topographer lease agreement, that the defendants breached both implied and express warranties as to the topographers, that the defendants fraudulently induced the plaintiffs to enter into the aforementioned contracts, and that defendants violated RICO.

With regard to Rule 23(b)(2) actions, the Fifth Circuit has held that monetary relief predominates in 23(b)(2) actions unless it is incidental to requested injunctive or declaratory relief. *Allison v. Citgo Petroleum*, 151 F.3d 402 (5th Cir.1998).[15] As explained by the Fifth Circuit:

> Thus, as claims for individually based money damages begin to predominate, the presumption of cohesiveness decreases while the need for enhanced procedural safeguards to protect the individual rights of class members increases, thereby making class certification under (b)(2) less appropriate. We know, then, that monetary relief "predominates" under Rule 23(b)(2) when its presence in the litigation suggests that the procedural safeguards of notice and opt-out are necessary, that is, when the monetary relief being sought is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case.

151 F.3d at 412. Here, the plaintiffs request a substantial amount of money for each individual plaintiff. Indeed, the plaintiffs request, at a minimum, that each plaintiff be awarded $5,732,750.00 for breach of their marketing agreements. Additionally, the determination of the relief should plaintiffs prevail most assuredly depends on the varying circumstances and merits of each potential class member's case. Therefore, the plaintiff's request for certification under Rule 23(b)(2) is denied.

### RULE 23(b)(3)

Rule 23(b)(3) requires this court to consider predominance[16] and superiority standards. The rule states that matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of

---

**15.** While this decision post-dates the certification hearing for the case at bar, the decision supersedes a withdrawn decision in which the holding regarding Rule 23(b)(2) actions was not disturbed. *Allison v. Citgo Petroleum*, 1998 WL 244989 (5th Cir. May 15, 1998).

**16.** Predominance is a judicial cousin to the commonality requirement present in Rule 23(a) with

predominance being the stricter of the two. The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members. *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993). The threshold for commonality is not high. *Applewhite*, 67 F.3d 571, 573.

any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.Pro. 23(b)(3).

■ In order to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," this court is duty bound to identify the substantive law issues which will control the outcome of the litigation. *Alabama v. Blue Bird Body*, 573 F.2d 309, 316 (5th Cir.1978). "A district court's duty to determine whether the plaintiff has borne its burden on class certification requires that a court consider variations in state law when a class action involves multiple jurisdictions." *Castano*, 84 F.3d 734, 741. Thus, "a requirement that a court know which law will apply before making a predominance determination is especially important when there may be differences in state law." *Id.* "Given the plaintiffs' burden, a court cannot rely on assurances of counsel that any problems with predominance or superiority can be overcome." *Id.* at 742 (citing *Windham v. American Brands, Inc.*, 565 F.2d 59, 70 (4th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978)).

■ It is well settled law that a federal court sitting in diversity must apply the choice of law rule of the forum in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As its choice of law rules, Mississippi follows the Second Restatement of Conflicts of Laws, more commonly referred to as the "center of gravity" test. *Mitchell v. Craft*, 211 So.2d 509, 512 (Miss.1968); *Craig v. Columbus Compress & Warehouse Co.*, 210 So.2d 645, 649 (Miss. 1968). Policy considerations relevant to the Second Restatement approach include: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relevant interest of those states in the determination of a partic-

ular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of results; (7) ease and determination in application of law to be applied. *Mitchell*, 211 So.2d at 516. When applying the "center of gravity" test, Mississippi employs the following two rules:

First, the law of a single state does not necessarily control every issue in a given case. We apply the center of gravity test to each question presented, recognizing that the answer produced in some instances may be that the law of this state applies and on other questions in the same case the substantive law of another state may be enforceable... Second, we recognize that there will be cases where, applying the center of gravity doctrine, we might conclude in the first instances that the law of another state should be applied. Where that law is contrary to the deeply ingrained and strongly felt public policy of this state, however, we have recognized that we may nevertheless apply and enforce this state's positive substantive law. (citations omitted.)

*Boardman v. United Services Automobile Asso.*, 470 So.2d 1024, 1031 (Miss.1985).

The named plaintiffs reside in eleven states and bring state law claims for breach of contract, breach of warranty, and fraud. Regarding contract actions, the Second Restatement approach takes into account the following factors: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188. Choice of law factors for tort actions are (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. Restatement (Second) of Conflict of Laws

§ 145.[17]  Finally, with regard to the breach of warranty claims, the process becomes slightly more complex.

■  Section 6 of the Second Restatement directs that within the confine of constitutional restrictions, a court will follow a statutory directive of its own state on choice of law.  Restatement (Second) of Conflict of Laws § 6.  Conflicts of law lean toward complication when characterization of an issue becomes pertinent to the determination, i.e., whether a state's statute of limitations is procedural or substantive.  Breach of warranty claims fall within these categories because of its similarity to recovery under tort theories.  See *Price v. Litton Systems, Inc.,* 784 F.2d 600, n. 8 (1986).  To this end, the Mississippi legislature adopted a separate conflict of laws rule for breach of warranty claims in its U.C.C. Mississippi Code § 75–1–105(1) states:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.  Failing such agreement, this code applies to transactions bearing appropriate relation to this state.  Provided, however, the law of the State of Mississippi shall always govern the rights and duties of the parties in regard to disclaimers of implied warranties of merchantability or fitness, limitations of remedies for breaches of implied warranties of merchantability or fitness, or the necessity for privity of contract to maintain a civil action for breach of implied warranties of merchantability or fitness notwithstanding any agreement by the parties that the laws of

some other state or nation shall govern the rights and duties of the parties.

Miss.Code Ann. § 75–1–105(1)(1978).  Therefore, Mississippi substantive law will apply on privity, disclaimers, and limitations of remedies only when the transaction giving rise to the warranty claim bears some reasonable relation to Mississippi.  *Price v. International Telephone and Telegraph,* 651 F.Supp. 706, 710 (S.D.Miss.1986).  After a remand from the Fifth Circuit, the two issues confronting the Southern District in *Price* were whether § 75–1–105 was constitutional and which state's laws governed the parties' breach of warranty claims.  *Id.* at 708.  In its Erie-guess, the court found that the Mississippi substantive law could only be used where a reasonable relationship to Mississippi existed in the transaction.  *Id.* The court determined that Mississippi's sole contact with the transaction was its designation as the forum state which was not a reasonable enough relationship to the transaction and, thereafter, it applied the "center of gravity" test to determine which state's law applied.  *Id.* at 710–11.  With the exception of the citizenship of one named plaintiff, the only relationship existing in this cause to Mississippi is that it is the forum.  Therefore, as found in Price, the significant contact analysis must be applied to the breach of warranty claims of the non-Mississippi plaintiffs.

■  As an initial matter, the court notes that to properly apply the "center of gravity" tests as it must, it is incumbent upon the court to examine each claim as it applies to the individuals.  At a minimum, the court's analysis will be conducted 33 times.[18]  This cause does not arise out of one common event, i.e., an explosion, but, instead, arises out of a series of events played out in at least

---

**17.**  Although not adopted by the Mississippi Supreme Court, the Second Restatement factors for misrepresentation include (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations; (b) the place where the plaintiff received the representations; (c) the place where the defendant made the representations; (d) the domicil, residence, nationality, place of incorporation and place of business of the parties; (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and (f) the place where the plaintiff is to render performance under a contract which he has been

induced to enter by the false representations of the defendant.  Restatement (Second) of Conflicts of Law § 148(2).

**18.**  The calculation comprises of three general theories, breach of contract, breach of warranty, and fraud, as applied to eleven represented jurisdictions.  The figure does not include separate claims under the general theories, i.e., the plaintiffs allege breach of the marketing agreement, breach of the lease/purchase agreement, and breach of oral contracts.

two different states, Texas and Tennessee. It involves multiple defendants and allegations of oral misrepresentations as well as oral contracts. It involves conduct on the part of representatives of "two societies," one named and one unnamed. It involves the actions and perceptions of the plaintiffs. It involves determination of theories of agency as applied to the particularized facts of each individual plaintiff, a determination of particular importance to Alcon.[19]

Additionally, the court anticipates that the breach of warranty claims will necessarily involve determination of privity of contract based upon the plaintiffs' allegation that representations were made that the topographer was reasonably suited to perform in a specified manner. Furthermore, differences among the various plaintiffs as to current use of the topographer affects whether a particular plaintiff may have claims under either express or implied warranties. At least seven of the named plaintiffs continue to use the topographer while two of the class representatives admit to having sold their machines.

The plaintiffs argue that there is no conflicts of law problem. Instead, they inform the court that the only state's laws involved in this cause will be the laws of Texas and Tennessee. Basing their argument on the representations made at the two seminars, the plaintiffs would like to convince the court that its analysis should be conducted on a group-wide basis. Unfortunately, this is not in compliance with the directives under the Second Restatement of Conflicts where there are so many variations in the factual setting. For instance, no one disputes that the potential purchasers of the PCM procedure were initially contacted in their respective home states regarding the seminars in the first instance. This raises important questions in regard to the representations made to each individual plaintiff. The court is particularly concerned that the plaintiffs seek violation of RICO as a part of their class action. It would seem somewhat contradictory to find that the defendants schemed to defraud by use of the mail, but, on the other hand, to find that the representations made at the Houston and Memphis seminars are the only legally significant representations.

■ Given the problems inherent in the court's determination of choice of law, the court finds that this cause simply cannot be certified as a class action. The District Court for the Eastern District of Louisiana found such choices to prevent certification in *In re Masonite Corporation* where the court stated:

*Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), of course, instructs federal courts to apply state law to products liability cases, and that creates a large-scale problem. Differences among state laws, and they abound, can combine with fact differences among plaintiffs' many claims, making the class model unmanageable and inefficient. The Fifth Circuit has expressed an unfriendly skepticism about the class action as an acceptable dispute resolution scheme when such problems are encountered. *Castano,* 84 F.3d at 742 n. 15. This circuit's *Castano* decision imposes stringent tests on potential class plaintiffs that district courts must apply: the plaintiff has the burden of satisfying the court that class treatment is appropriate, the trial court must conduct a

---

**19.** The court is particularly uncomfortable with the presence of a defendant in a class action whose liability for some claims possibly hinges on oral contracts and/or representations. As stated in *Castano:*

In the context of mass tort class actions, certification dramatically affects the stakes for defendants. Class certification magnifies and strengthens the number of unmeritorious claims. *Agent Orange,* 818 F.2d at 165–66. Aggregation of claims also makes it more likely that a defendant will be found liable and results in significantly higher damage awards. MANUAL FOR COMPLEX LITIGATION S 33.26 n. 1056; Kenneth S. Bordens and Irwin

A. Horowitz, Mass Tort Civil Litigation: The Impact of Procedural Changes on Jury Decisions, 73 JUDICATURE 22 (1989). In addition to skewing trial outcomes, class certification creates insurmountable pressure on defendants to settle, whereas individual trials would not. See Peter H. Schuck, Mass Torts: An Institutional Evolutionist Perspective, 80 CORNELL L.REV. 941, 958 (1995). The risk of facing an allor-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low. *Rhone–Poulenc,* 51 F.3d at 1298. These settlements have been referred to as judicial blackmail.
*Castano,* 84 F.3d 734, 746.

rigorous de novo review of state law, and conditional certification cannot justify a court's overlooking problems with predominance or superiority. *Castano* reflects a new scrutiny that is apprehensive of claims about the social utility of class actions in the mass tort setting.

*In re Masonite Corporation,* 170 F.R.D. 417, 421 (E.D.La.1997).

While the parties concede that the marketing agreement contains a choice of law provision designating Tennessee as the appropriate forum and, thereby, rendering it the only viable claim for class certification, the court finds that the variations in facts defeat the predominance factor of Rule 23(b)(3).[20] Where individual questions of fact predominate over questions that are common to the class, a district court cannot certify a class under Rule 23(b)(3). *Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1297 (7th Cir.), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995); *In re Masonite Corp.,* 170 F.R.D. 417. The Fifth Circuit instructs that when conduct on the part of the plaintiffs individualizes each case, class certification will be inappropriate. *Castano,* 84 F.3d 734, 740.

As illustrated above, factual differences abound in this cause of action. Attendance at the seminars creates factual issues as well. Because there were several seminars in Houston and several in Memphis, problems arise when considering oral representations made at each of the separate seminars. Furthermore, not all the class representatives attended both the Houston and Memphis seminars. The plaintiffs support their claims through the alleged oral misrepresentations regarding price, regarding service and upgrades, and regarding compatibility with the ReSeeVit. Variations exist in substance, time, and, potentially, sources. For just these reasons, the Fifth Circuit has held that a fraud class action cannot be certified when individual reliance will be an issue. *Castano,* 84 F.3d at 744 (citing *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482

F.2d 880 (5th Cir.1973)). In *Simon,* the court stated:

> If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action. Thus, courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action. Similarly, if the writings contain material variations, emanate from several sources, or do not actually reach the subject investors, they are no more valid a basis for a class action than dissimilar oral representations. (Citations omitted.)

*Simon,* 482 F.2d 880, 882; See also *Gatzke v. Owen,* 69 F.R.D. 412, 415 (N.D.Miss.1975).

Finally, with regard to the requirement for superiority, the court finds that the plaintiffs fail to meet their burden. Maintenance of this cause as a class action would not achieve judicial economy. Determination of the proper choice of law alone would consume vast amounts of this court's time and resources. Additionally, the request for damages for each individual plaintiff is very high indicating that at least some of these potential class members may well wish to control the course of their own litigation. See *Castano,* 84 F.3d 734, 748.

The court's decision today in no way reflects its opinion regarding the merits. For all of the above-stated reasons, this court finds that the plaintiffs have not met their burden and that the motion for certification shall be denied. An appropriate order shall be issued.

### ORDER

In accordance with a memorandum opinion issued concurrently,

IT IS ORDERED:

class certification on RICO claim where "an introverted reliance as to each aggrieved person must be shown" and finding that the predominate issues are "largely discreet and personal").

---

**20.** With regard to the RICO claim, the court finds that the variations of fact prevent this claim from proceeding as the basis of a class action as well. See *Young v. Ray Brandt Dodge, Inc.,* 176 F.R.D. 230 (E.D.La.1997) (denying motion for

That the plaintiffs' motion for class certification is hereby denied.

SO ORDERED,